# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### February 5, 2014 Session

## JERRY RAY DAVIDSON v. STATE OF TENNESSEE

**Appeal by Permission from the Court of Criminal Appeals**
**Circuit Court for Dickson County**
**No. CR-7386      Robert E. Burch, Judge**

_____

**No. M2010-02663-SC-R11-PD - Filed November 17, 2014**

_____

This post-conviction appeal addresses the extent of defense counsel's duty to present mitigation evidence during the penalty phase of a capital murder trial. Defense counsel in a capital case possessed evidence that their client suffered from severe lifelong cognitive impairments and personality disorders and that he was predisposed to sexual violence. However, during the defendant's trial, defense counsel presented the jury with no psychological mitigation evidence and only cursory social history mitigation evidence. A Dickson County jury convicted the defendant of premeditated first degree murder and imposed the death penalty. The jury also convicted the defendant of aggravated kidnapping, for which the defendant received a twenty-year sentence. Following unsuccessful direct appeals, *State v. Davidson*, 121 S.W.3d 600 (Tenn. 2003), the defendant filed a petition for post-conviction relief in the Circuit Court for Dickson County. Following a hearing, the post-conviction court denied the petition, and the Court of Criminal Appeals affirmed the post-conviction court's decision. *Davidson v. State*, No. M2010-02663-CCA-R3-PD, 2013 WL 485222 (Tenn. Crim. App. Feb. 7, 2013). We find that, under the circumstances of this case, defense counsels' failure to develop and present psychological mitigation evidence deprived their client of his right to effective assistance of counsel. While we uphold the client's convictions, we vacate his death sentence and remand for a new capital sentencing hearing.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal**
**Appeals Affirmed in Part; Reversed in Part**

WILLIAM C. KOCH, JR., J., delivered the opinion of the Court, in which SHARON G. LEE, C.J., JANICE M. HOLDER, and CORNELIA A. CLARK, JJ., joined. GARY R. WADE, J., filed an opinion concurring in part and dissenting in part.

Kelly A. Gleason and Sarah R. King, Office of the Post-Conviction Defender, Nashville, Tennessee, for the appellant, Jerry Ray Davidson.

Robert E. Cooper, Jr., Attorney General and Reporter, William E. Young, Solicitor General, and Jeffrey D. Zentner, Assistant Attorney General; Dan Alsobrooks, District Attorney General and Robert S. Wilson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.**

On the night of September 26, 1995, Virginia Jackson took a taxi cab to a bar in Dickson, Tennessee. When closing time approached, she found herself in need of a ride home. Jerry Ray Davidson, a convicted sex offender,[1] was also at the bar. He offered to give Ms. Jackson a ride home. She was never again seen alive.

On October 19, 1995, two deer hunters found Ms. Jackson's headless body partially buried in the woods a few miles from her house. Ms. Jackson's head was never recovered, and thus her cause of death could not be definitively determined. However, circumstantial evidence strongly suggested that Mr. Davidson had murdered her.

Mr. Davidson was arrested and indicted for kidnapping and murder. His trial counsel procured a set of Mr. Davidson's mental health records from the Tennessee Department of Correction ("TDOC Records"). These records painted a dim picture, not only of Mr. Davidson's mental health, but also of his social and family history. They also showed that he had been evaluated and unsuccessfully treated during several previous incarcerations for sex crimes and that he had fantasies of raping and hurting women. Included in the records were warnings from those who had tried and failed to rehabilitate Mr. Davidson that he would be a serious danger to the public following his release from prison.

Before trial, Mr. Davidson spent twenty-seven days at the Middle Tennessee Mental Health Institute ("MTMHI"), where he was observed and psychologically tested. His brain was scanned. Although the records from Mr. Davidson's stay at MTMHI ("MTMHI Records") acknowledge his mental illness and his troubled social history, his evaluators did

---

[1]Mr. Davidson had been convicted in 1971 of assault and battery with intent to rape. In 1976, he was convicted of assault and battery with intent to ravish and to have unlawful carnal knowledge of a female over twelve years of age. In 1983, he was convicted of felonious crime against nature and felonious sexual battery. *State v. Davidson*, 121 S.W.3d 600, 609-10 (Tenn. 2003).

not find that he was incompetent to stand trial or incapable of committing a premeditated murder.

Mr. Davidson's trial counsel obtained the trial court's authorization to hire a mitigation specialist and a neuropsychologist. The mitigation specialist reviewed many of Mr. Davidson's records and sent counsel a brief report highlighting the potential mitigation evidence contained in those records. The mitigation specialist also expressed concern that she lacked sufficient time to build an effective mitigation case.

Mr. Davidson's trial counsel also retained Dr. Pamela Auble to evaluate Mr. Davidson prior to trial. He provided Dr. Auble with Mr. Davidson's TDOC Records but not his MTMHI Records. Dr. Auble interviewed Mr. Davidson for three hours and performed several basic screening tests, but she did not have time to perform the neuropsychological tests she would have normally performed. Like the mitigation specialist, Dr. Auble wrote counsel a letter expressing her concern that she lacked adequate time to properly evaluate Mr. Davidson. Neither Dr. Auble nor the mitigation specialist testified at trial.

Mr. Davidson's trial occurred in August 1997, and a jury in the Circuit Court for Dickson County convicted him of first-degree premeditated murder and aggravated kidnaping. Mr. Davidson's trial counsel offered no clinical mental health evidence whatsoever during the guilt phase of his trial. He also presented no mitigating mental health evidence at the sentencing hearing. We previously summarized Mr. Davidson's mitigation evidence at sentencing as follows:

> In mitigation, the defense presented the testimony of Davidson's mother, several of his co-workers, and his minister. Davidson's mother related that, as a child, he had lived with his grandparents and had not completed school because he was always in trouble with the law. She described her son as a quiet boy who had few friends. He had no contact with his father throughout his life. At some indefinite time in the past, he had spent one to two years at Central State Hospital for mental problems. Davidson's mother testified about how badly Davidson had taken his younger brother's death in Vietnam and how he had helped her at home. Next, several of Davidson's co-workers testified that he was a good worker, a good friend, and a nice, considerate man who would help anyone. They found Davidson's involvement in Jackson's murder inconsistent with his behavior when he was around them. The last witness for the defense was Joe Ingle, a minister, who described Davidson as

-3-

quiet and passive, with an interest in the Bible's prophetic books and an openness to learning new things. Ingle opined that Davidson would not be a threat in prison and would participate in work or educational programs.

*State v. Davidson*, 121 S.W.3d at 610.

On September 3, 1997, the jury sentenced Mr. Davidson to death after finding that the State had proved three statutory aggravating circumstances beyond a reasonable doubt.[2] The Court of Criminal Appeals affirmed Mr. Davidson's convictions and sentences. *State v. Davidson*, No. M1998-00105-CCA-R3-CD, 2002 WL 15381 (Tenn. Crim. App. Jan. 7, 2002). In 2003, this Court, in a divided vote, upheld Mr. Davidson's conviction for first degree premeditated murder and his sentence of death, as well his conviction and sentence for aggravated kidnapping. *State v. Davidson*, 121 S.W.3d at 623.

On August 12, 2004, Mr. Davidson filed a petition for post-conviction relief. His primary allegation was ineffective assistance of counsel. The post-conviction court conducted several evidentiary hearings between 2006 and 2009 and on November 10, 2010, denied Mr. Davidson's petition for post-conviction relief. The Court of Criminal Appeals likewise denied post-conviction relief on each of Mr. Davidson's claims. *Davidson v. State*, No. M2010-02663-CCA-R3-PD, 2013 WL 485222 (Tenn. Crim. App. Feb. 7, 2013). We granted Mr. Davidson permission to appeal. Mr. Davidson raises numerous issues in his supplemental brief to this Court that were not raised in the Court of Criminal Appeals. We deem these new issues waived.

After carefully reviewing the record, we have concluded that Mr. Davidson was prejudiced at his sentencing hearing by his counsel's ineffective assistance because his counsel failed to give the jury any mitigating information regarding Mr. Davidson's intellectual and cognitive deficiencies. Withholding this mental health information stemmed more from counsel's superficial investigation than from a legitimate strategic choice. However, in all other respects we affirm and adopt the reasoning of the Court of Criminal Appeals. Although we uphold Mr. Davidson's convictions for first-degree premeditated murder and aggravated kidnapping, we vacate Mr. Davidson's death sentence and remand the case to the trial court for a new capital sentencing hearing.

---

[2]The jury found that the State had proved beyond a reasonable doubt that (1) the defendant was previously convicted of one or more prior felonies whose statutory elements involve the use of violence to the person; (2) the murder was knowingly committed during a kidnaping; and (3) the defendant knowingly mutilated the body of the victim after death. Tenn. Code Ann. § 39-13-204(i)(2), (7), (13) (Supp. 2014).

This case provides an opportunity to clarify the standards that capital defense attorneys must meet in order to provide effective representation at sentencing. Accordingly, we will begin by reviewing the standards used to assess the effectiveness of counsel's representation, with particular emphasis on the discovery and use of mitigation evidence in capital cases. We will then review the relevant facts from the post-conviction record and explain why this case warrants a new sentencing hearing.

## II.

This claim has been brought under Tennessee's Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-101 to -122 (2012 & Supp. 2014). The Act directs Tennessee's courts to grant post-conviction relief to a person "in custody" whose "conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. §§ 40-30-102, -103. Mr. Davidson alleged in his post-conviction petition that his constitutional right to effective assistance of counsel had been abridged. The post-conviction court and the Court of Criminal Appeals found that Mr. Davidson had not proved that he received ineffective assistance of counsel.

A post-conviction petitioner bears "the burden of proving the allegations of fact by clear and convincing evidence." Tenn. Code Ann. § 40-30-110(f); *see also* Tenn. Sup. Ct. R. 28, § 8(D)(1). In this case, the facts are not materially in dispute. The question we must consider is whether the undisputed facts concerning trial counsel's pursuit and presentation of mitigation evidence show that counsel's performance was constitutionally deficient and prejudicial. Both prongs of this analysis involve mixed questions of law and fact – questions this Court reviews de novo without any presumption that the court below was correct. *Strickland v. Washington*, 446 U.S. 668, 698 (1984); *Calvert v. State*, 342 S.W.3d 477, 485 (Tenn. 2011)*; see also Williams v. Taylor*, 529 U.S. 362, 419 (2000) (Rehnquist, C.J., concurring in part and dissenting in part).

Article I, section 9 of the Tennessee Constitution establishes that every criminal defendant has "the right to be heard by himself and his counsel." The Sixth Amendment to the United States Constitution likewise guarantees that all criminal defendants "shall enjoy the right . . . to have the [a]ssistance of [c]ounsel." These constitutional provisions have been interpreted to guarantee a criminal defendant the right to the "effective assistance of counsel" at trial. *Strickland v. Washington*, 466 U.S. at 686; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975).

To prevail on a claim of ineffective assistance of counsel, a petitioner must prove both that counsel's performance was deficient and that the deficient performance prejudiced the

defense. *Strickland v. Washington*, 466 U.S. at 687; *Felts v. State*, 354 S.W.3d 266, 276 (Tenn. 2011). A court need not address both prongs if the petitioner fails to demonstrate either one of them. *Strickland v. Washington*, 466 U.S. at 697; *Garcia v. State*, 425 S.W.3d 248, 257 (Tenn. 2013).

Deficient performance means that "counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. at 688. To determine reasonableness, a reviewing court must consider the "professional norms" prevailing at the time of the representation. *Strickland v. Washington*, 466 U.S. at 688; *see also Baxter v. Rose*, 523 S.W.2d at 932-33. Counsel's performance is not deficient if the advice given or the services rendered "are within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d at 936. In *Strickland v. Washington*, the United States Supreme Court explained that

> strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland v. Washington*, 466 U.S. at 690-91.

Therefore, we begin our review with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all strategic and tactical significant decisions. The petitioner bears the burden of overcoming this presumption. *Strickland v. Washington*, 466 U.S. at 690; *see also Burt v. Titlow*, 571 U.S. __, __, 134 S. Ct. 10, 17 (2013); *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999). Reviewing courts should resist the urge to evaluate counsel's performance using "20-20 hindsight." *Mobley v. State*, 397 S.W.3d 70, 80 (Tenn. 2013) (quoting *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982)); *see also Strickland v. Washington*, 466 U.S. at 689 (instructing reviewing courts to try "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time").

The second prong of *Strickland* concerns whether counsel's deficient performance "prejudiced" the defendant. The question under this prong is "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) (citing *Strickland v. Washington*, 466 U.S. at 687). To prove prejudice, the petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. at 694. A "reasonable probability" is a lesser burden of proof than "a preponderance of the evidence." *Williams v. Taylor*, 529 U.S. at 405-06; *Pylant v. State*, 263 S.W.3d 854, 875 (Tenn. 2008). A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. at 694; *see also Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006); *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996).

In death-penalty cases, the right to effective assistance of counsel extends beyond the guilt-and-innocence phase of the trial. We have said that courts must be

> particularly cautious in preserving a defendant's right to counsel at a capital sentencing hearing. The Eighth and Fourteenth Amendments to the United States Constitution mandate that a death sentence be based on a particularized consideration of relevant aspects of the character and record of each defendant. In this respect, evidence about the defendant's background and character is relevant because of the belief that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems may be less culpable than defendants who have no such excuse. Thus, although there is no requirement that defense counsel present mitigating evidence in the penalty phase of a capital trial, counsel's duty to investigate and prepare for a capital trial encompasses both the guilt and sentencing phases. [Defense attorneys who anticipate a capital sentencing hearing possess a] greater duty of inquiry into a client's mental health . . . [C]ounsel may not treat the sentencing phase as nothing more than a mere postscript to the trial.

*Goad v. State*, 938 S.W.2d at 369-70 (citations, ellipses, and quotation marks omitted). At the sentencing hearing, the jury hears new evidence and new arguments to help the jury determine whether to impose death by execution, lifetime imprisonment without parole, or a life sentence. *See Williams v. Taylor*, 529 U.S. at 393; Tenn. Code Ann. § 39-13-202 (2014).

Because mitigation evidence is often a critical component in a capital sentencing trial, the United States Supreme Court has held that the Constitution requires that "the sentencer in capital cases must be permitted to consider any relevant mitigating factor."[3] *Porter v. McCollum*, 558 U.S. 30, 42 (2009) (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982)). Under the Eighth Amendment's "cruel and unusual punishments" clause, the death penalty is only appropriate for the worst murderers. *Roper v. Simmons*, 543 U.S. 551, 568 (2005) ("Capital punishment must be limited to those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution.'" (quoting *Atkins v. Virginia*, 536 U.S. 304, 319 (2002))). Tennessee law concomitantly requires capital sentencing juries to find beyond a reasonable doubt that the aggravating factors in the case outweigh any mitigating factors. Tenn. Code Ann. § 39-13-204(f)(2).

Mitigation evidence includes facts about the defendant's personal makeup and life history. *See* Tenn. Code Ann. § 39-13-204(j) (listing types of mitigation evidence). This evidence often serves to humanize the defendant and reveals aspects of the defendant's life or inner workings that might affect the jury's assessment of the defendant's moral culpability for the crime. Again, mitigation evidence is critical "because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)); *see also Zagorski v. State*, 983 S.W.2d 654, 658 (Tenn. 1998).

Counsel representing a defendant in a capital case is not required to present mitigating evidence at sentencing in every case or to run down every conceivable line of potentially mitigating evidence. *Wiggins v. Smith*, 539 U.S. 510, 533 (2003). However, for counsel's strategic and tactical choices to be entitled to deference, they must be "informed ones based

---

[3]*See also* Tenn. Code Ann. § 39-13-204(c):

> In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment, and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i); and any evidence tending to establish or rebut any mitigating factors. Any such evidence that the court deems to have probative value on the issue of punishment may be received, regardless of its admissibility under the rules of evidence; provided, that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted.

upon adequate preparation." *Goad v. State*, 938 S.W.2d at 349. The United States Supreme Court has noted that "'strategic choices made after less than complete investigation are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation.'" *Wiggins v. Smith*, 539 U.S. at 533 (quoting *Strickland v. Washington*, 466 U.S. at 690-91). Accordingly, counsel's decision not to investigate or present mitigation evidence "must be directly assessed for reasonableness in all circumstances." *Strickland v. Washington*, 466 U.S. at 691.

Between 2000 and 2010, the United States Supreme Court has had several opportunities to address claims of ineffective assistance of counsel in the context of investigating and presenting mitigating evidence in capital proceedings. The Court noted that presenting some mitigating evidence does not "foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant." *Sears v. Upton*, 561 U.S. 945, 130 S. Ct. 3259, 3266 (2010). It also stated that its inquiry in these cases called for a "probing and fact-specific analysis" that included consideration of "the totality of the available mitigation evidence – both that adduced at trial and the evidence adduced in the [collateral] proceeding." *Sears v. Upton*, 130 S. Ct. at 3266; *see also Wiggins v. Smith*, 539 U.S. at 527.

## III.

We will now apply the principles identified in *Goad v. State* and those employed by the United States Supreme Court with regard to the presentation of mitigation evidence in capital cases. The following facts from Mr. Davidson's post-conviction record are relevant to the question of whether counsel's representation at sentencing was legally deficient.

Mr. Davidson's trial counsel possessed a collection of Mr. Davidson's mental health records. The most recent of these records were the MTMHI Records. Although Mr. Davidson's attorneys obtained these records before trial, they did not share them with the neuropsychologist they had retained. Nor did they introduce any of these records at trial.

Among the MTMHI Records are a CT scan of Mr. Davidson's head, performed on March 24, 1997. The opinion of the doctor who reported the scan was that Mr. Davidson had "[s]light prominence of the sulci, particularly in the posterior fossa[,] compatible with mild atrophy." At a post-conviction hearing, psychiatrist Peter I. Brown explained that this finding meant that Mr. Davidson suffered from cerebral atrophy: "a significant shrinking . . . an actual decrease in the amount of brain tissue."

The MTMHI Records also contain a report of an EEG of Mr. Davidson's brain activity. The report identified an "[a]bnormal EEG because of a slight excess of

asynchronous slowing in all quadrants." Dr. Brown later explained to the post-conviction court that this meant the electrical activity in Mr. Davidson's brain was "out of beat." This abnormality would interfere with Mr. Davidson's executive functioning[4] and his ability to behave coherently.

Mr. Davidson's counsel also possessed the older TDOC Records which chronicled Mr. Davidson's interactions with mental health professionals during the decades leading up to the murder. These records were examined (at least in part) by the neuropsychologist and the mitigation specialist who counsel belatedly retained prior to trial.

The TDOC Records reveal Mr. Davidson to be a very mentally disturbed individual. A 1979 letter from a forensic psychiatrist in Chattanooga to a state judge explains that Mr. Davidson "does have a rather serious defect of judgment based on his mental illness, which prevents him from being fully aware of the social consequences of all his behavior." A September 1980 social history report includes Mr. Davidson's self-report that he had been diagnosed with "undifferentiated schizophrenia" in the tenth grade. When asked why he had been admitted to a mental hospital as a teenager, Mr. Davidson said it was because he "liked to grab at girls' pussies." Additionally,

> He reports that his favorite activities as a child were "raping girls, movies, fishing, and skating." He reports that he has raped over one hundred girls and women in his life, "if you use the legal definition." He states that the only difference between making love and raping women is whether or not the girl likes it.

The report noted that during his therapy sessions, Mr. Davidson "has demonstrated a remarkable lack of insight into his behavior, expresses no feelings of guilt about the incidents, and expects to behave similarly when he is released."

Another significant document from the TDOC Records is Mr. Davidson's own handwritten account of his personal history and sex crimes. Recalling his teenage years, Mr. Davidson said, "I got sex in my own way. It was a force which I could not direct in the

---

[4]Executive functioning involves "the ability to think abstractly and to plan, initiate, sequence, monitor, and stop complex behavior. It involves a person's ability to develop and carry out plans, to form analogies, to obey social rules, to solve problems, to adapt to unexpected circumstances, to do several tasks simultaneously, and to place episodes in time and place." *In re Conservatorship of Groves*, 108 S.W.3d 317, 338, n. 78 (Tenn. Ct. App. 2003).

acceptable way nor could I control it.  I am talking about rape."  Mr. Davidson recounts numerous rapes in his past, and fantasizes about raping another woman he knows:

> There is no way that I can kidnap her though because she is not scared of me. . . .  She thinks her [daughter] is everything . . . It would be easy to completely take control over [her daughter] and once I had [her daughter, she] would do anything I asked her to, "I think."  She would let me put a chain around her with padlocks and then I could just drive to East Tenn[essee].

More alarming content emerges from Mr. Davidson's progress records from his incarceration at the DeBerry Correctional Institute in the early 1980s.  Mr. Davidson told prison personnel that he "must have pussy to survive."  He told them he had "raped over 100 women," and "raped 150-200 times."  Mr. Davidson reportedly said there were "two kinds of relationships with women: courtship and rape.  And he is no good at courtship."  Another report stated that Mr. Davidson's thought processes continued to be "antisocial."  Most of his discussions "center around his plans to continue assaulting women when he gets out." A 1981 handwritten note from a prison psychologist contains Mr. Davidson's explanation that his "problem" was, in his words, "I like to rape women."  The note concluded that "[a]t this time, Mr. Davidson does not appear to have the psychological resources to effectively deal with an unsupervised placement in the free world community."

Nevertheless, Mr. Davidson was subject to mandatory release.  A 1982 letter from a clinical psychologist to the Tennessee Board of Pardons and Paroles expressed concern over the fact that Mr. Davidson had been released from prison because "he may be inclined to commit rape/murder."  During the months that Mr. Davidson lived at the DeBerry Correctional Institute, "several staff members were of the opinion that he would likely be a very real threat to others when released."  Another psychological report from this time period noted that Mr. Davidson was "maladjusted mentally," had "severe psychiatric disturbance," and "is impulsive and is unable to control his impulses."  A psychological evaluation from March 1984 stated that at times Mr. Davidson "may have difficulties controlling his impulses and may act out without thought of his consequences to his behavior."  The report also said he "seems to accept violence as a way of maintaining control over women."

Mr. Davidson's lead counsel at trial was Collier Goodlett, an attorney with the public defender's office in Clarksville.  His co-counsel was Mike Love, an attorney in private practice whose health issues rendered him unavailable to testify at the post-conviction hearings.  Mr. Goodlett appeared before the post-conviction court on November 14, 2006, and testified that at the time of the trial he was familiar with the ABA Death Penalty

Guidelines, as well as related materials produced by the Tennessee Association of Criminal Defense Lawyers.

Mr. Goodlett provided a general definition of mitigation evidence. Such evidence, he said, included "[a]lmost anything that tends to persuade the jury that a lesser punishment than death is appropriate," including "any number of things that would affect somebody's ability to deal with a situation." Useful mitigation evidence, Mr. Goodlett said, could include how the defendant was raised, including the parents' alcohol use, and any history of violence or mental illness in the family. "You would want to look at their education," Mr. Goodlett said, noting that Mr. Davidson "was picked on," and that "it would be interesting to know where that stemmed from."

Mr. Goodlett explained that his office was overworked and understaffed in the months leading up to Mr. Davidson's trial. Mr. Goodlett had a full caseload in addition to two capital cases during this time period. He had no secretary, and an independent organization recommended doubling the number of attorneys in his office. Additionally, Mr. Love was suffering from significant health problems. Nevertheless, counsel did perform a cursory investigation of Mr. Davidson's mental and social history, and briefly enlisted the help of others.

On July 10, 1997, less than one month before the scheduled trial date, the defense team filed a motion seeking funds for expert assistance from a neuropsychologist. The court granted this request on July 14, 1997, authorizing up to $3,000 to spend on Dr. Auble's services. In the motion, defense counsel stated:

> **14. Basis for Request.**
> The preparation of each and every murder case should include a realistic expectation that the case will reach a sentencing hearing. Therefore it is imperative from the very beginning that the defense counsel seek out and put together a complete psychological, and mental health of the defendant. Otherwise, mitigating circumstances may go undiscovered or misunderstood. With the Accused's life in the balance, . . . "[i]t is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." ABA Standards for Criminal Justice (2d ed.), The Defense Function § 4-4.1. (emphasis added.) The Commentary to this section includes the following:

The lawyer also has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court in sentencing. This cannot effectively be done on the basis of broad emotional appeals or on the strength of statements made to the lawyer by the defendant. Information concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant, as will mitigating circumstances surrounding the commission of the offense itself. Investigation is essential to fulfilling these functions.

Defense counsel also stated:

it is imperative from the very beginning that the defense team aggressively search out and put together a complete economic, educational, medical, mental health and psycho/social history of the client from several generations prior to the accused birth to the present day. Full mitigation investigation will require compiling and reviewing all available psychiatric and social service agency records, as well as interviewing and testing the accused.

Defense counsel previously included nearly identical language in their motion – filed in April 1997 – requesting funding for social history research to be conducted by mitigation specialist Gloria Shettles. On June 2, the trial court authorized $5,000 for Ms. Shettles's work.

On June 19, 1997, Ms. Shettles sent counsel a letter stating that she was "very concerned with the trial date," which she believed to be August 4, 1997. Ms. Shettles said an adequate investigation usually required "at least four months . . . under the best of circumstances." Ms. Shettles asked Mr. Goodlett to call her as soon as possible to discuss her preliminary work. In all, Ms. Shettles billed counsel for 40.5 hours of work, plus other charges, for a total fee of $2,564.92.

At a post-conviction hearing in September 2008, Ms. Shettles testified that she normally devoted nine months to developing a capital sentencing mitigation case. After explaining the types of investigations she normally performs, she testified that in this case she did "very, very little. I was given a very, very brief period of time to complete tasks and

I was asked specifically to do very, very few things in this particular case." She said she did not do more because she received very little communication and direction from the attorneys. Ms. Shettles testified: "I just didn't want to waste time and money for an investigation that I had no idea what direction we were going in." Before trial, Ms. Shettles was able to examine many of Mr. Davidson's mental health records. On July 11, 1997, she sent counsel a five-page report that highlighted relevant facts contained in these records.

Dr. Auble's involvement in the case was similarly limited. During her testimony at the September 2008 hearing, Dr. Auble explained that she worked on the case for "only twenty days basically. . . . I didn't have very much time to devote to this case." The materials she reviewed for the defense included "basically some prison records and some evaluations that were done at the Department of Corrections. There's a chaplain's report. It's not very much. It's just a few things. . . . It might be twelve pages." Dr. Auble said she did not know the MTMHI Records even existed.

Dr. Auble spent three hours interviewing and testing Mr. Davidson. She explained that although she was a neuropsychologist, all she did was a basic evaluation. She stated that "I interviewed him and did psychological testing. I didn't do neuropsychological testing. There wasn't time for that and I didn't have enough information to know that there was a need for that." Dr. Auble testified that she had evaluated fifty people who had been on death row, including thirty current occupants. She said Mr. Davidson was the only one for whom she did not perform neuropsychological testing. Dr. Auble testified that although she had been authorized to do thirty hours of work, she had only done 7.5 hours. "There just wasn't enough time," she said, to do even the minimal screening she would normally perform for a death penalty defendant.

Dr. Auble sent counsel a four-page report in July 1997. In her report, Dr. Auble concluded that Mr. Davidson was not "floridly psychotic" at the time of her interview, and that he "appeared competent to stand trial." Her "diagnostic impression," however, was that he suffered from "adjustment disorder with anxiety in a schizotypal personality disorder." He had "the potential for psychotic episodes under stress," "difficulty relating to others effectively," and "his thinking may get in the way of his accurate perceptions of situations." Dr. Auble's report also briefly described Mr. Davidson's "difficult childhood," poor performance in school, and his "long history of mental illness."

When he appeared at a November 2006 post-conviction hearing, Mr. Goodlett was unable to give a satisfactory explanation for his truncated investigation other than that he was harried and overworked. Post-conviction counsel asked Mr. Goodlett about documents he possessed which showed Mr. Davidson had been diagnosed as schizophrenic as far back as

the 1960s: "Was there any reason not to want to revisit that diagnosis for the trial?" "No," answered Mr. Goodlett, "we should have done that."

At the post-conviction hearing, Mr. Goodlett was given a copy of the report by mitigation specialist Gloria Shettles. When asked if he read the whole report, Mr. Goodlett responded, "I don't know that I did." Although Ms. Shettles's report highlighted key documents in Mr. Davidson's medical records, Mr. Goodlett could not recall whether he had read those highlighted records.

Mr. Goodlett testified that he retained Dr. Auble "ever so briefly" before trial, but that she did not give him anything "helpful" to his case. Mr. Goodlett was also asked about the MTMHI Records, which Dr. Auble later testified she never received:

> Q:      Were you aware that Mr. Davidson had an abnormal EEG and some atrophy according to the CT scan prior to trial?
> A:      I don't know that I was.
> Q:      Were you the one that was charged with the responsibility of reviewing this or was that Mr. Love or somebody else?
> A:      I suspect that I reviewed it, but unfortunately it would have, I guess, been fairly cursory unfortunately.
> Q:      Do you know whether this full [MTMHI Records] was supplied to Dr. Auble?
> A:      I do not know.

Mr. Goodlett agreed that at sentencing, he "should have presented a lot more evidence as to [Mr. Davidson's] psychological background" and his family situation beyond simply having his mother, some co-workers, and a minister testify.

Mr. Goodlett was also asked to describe his "theory of the case at sentencing." Mr. Goodlett said his theory at sentencing "was that the [S]tate really had no idea of how this woman died. That the proof, though they found him guilty, was so thin that it simply did not merit the death of Jerry Davidson. . . . there should have been sort of a – what you call a lingering doubt or some such." Mr. Goodlett agreed that the defense presented "no psychological evidence at all" at the sentencing trial.

Post-conviction counsel was able to obtain two experts who peered more deeply into Mr. Davidson's psychological condition. Neuropsychologist Dr. Malcolm Spica examined Mr. Davidson twice in 2006 and reviewed his mental health records. Dr. Spica determined that Mr. Davidson had a full-scale I.Q. of 89, but that his nonverbal processing score was 79, "ranking below 92% of the general population and only nine points above the threshold of

mental retardation." Mr. Davidson's "higher-order reasoning" skills were equivalent to those of a ten year old on one test, and at the level of a nine year old on another. Dr. Spica said that when under pressure, Mr. Davidson performed at a "much lower (severely impaired range)." To Dr. Spica, these findings "sharply raise[d] the possibility of a formal thought disorder." This "instability" of judgment and reasoning was a type "often associated with frontal cerebral lobe dysfunction." In addition to Mr. Davidson's "instability of reasoning," Dr. Spica expressed concern with Mr. Davidson's "deficits in discriminating between actual information and distorted approximations." Dr. Spica diagnosed Mr. Davidson as having cognitive, depressive, and anxiety disorders – all not otherwise specified.

At a September 2008 post-conviction hearing, Dr. Spica explained his report and testified that he was confident that Mr. Davidson had not malingered or otherwise feigned his symptoms. While Mr. Davidson was able to engage people effectively in conversations, Dr. Spica found that beyond that language proficiency he was "a man of limited internal resources, limited cognitive power, and his reasoning is more like a much younger individual. It's nine or ten years old, although at other times he performed far below that. It's the picture of brain dysfunction."

Psychiatrist Peter I. Brown also interviewed Mr. Davidson and reviewed previous mental health records, including Dr. Spica's report. Dr. Brown found that Mr. Davidson exhibited "clear, consistent, and severe deficits" in regard to reasoning, abstraction and generalization, and executive function. Dr. Brown opined in his report that Mr. Davidson's "cognitive processes are not only defective but fragile," and "particularly vulnerable to external influences, such as situations that produce strong emotions," which seriously compromised his ability to, for example, premeditate. Dr. Brown diagnosed him with not otherwise specified cognitive disorder and schizotypal personality disorder. "[T]he clinical data," he said, "are consistent with the emotional and social functioning of, at most, a child in the primary to middle school range," which indicates "significant impairments in his capacities to plan, consider or evaluate and effectively carry out behavior" – a condition he described as "frontal lobe dysfunction (or 'functional lobotomy')." Mr. Davidson, Dr. Brown said, is "'socially and emotionally retarded' with a functional level corresponding at most to those of a ten year old."

Dr. Brown elaborated on these findings in his testimony at a hearing in September 2008. Having studied Mr. Davidson's mental health records, Dr. Brown noted that the people who had treated Mr. Davidson previously "met with almost no progress because of the lack of cognitive and affective and social skills." He characterized Mr. Davidson's thinking as "primitive" and highly disorganized. Mr. Davidson was unable to accurately interpret and respond to social cues, he said. Although Mr. Davidson could function perfectly well in a highly-structured environment, such as a prison, Dr. Brown testified that

outside such environments, he would have "a great deal of difficulties and very few resources." Not only was Mr. Davidson mentally impaired, but he also lacked the support of any close friends or colleagues or family members. While he acknowledged that Mr. Davidson had at least attempted to rape women in the past, he believed Mr. Davidson's statements about raping hundreds of women were fantasies and exaggerations. While he acknowledged that people who treated Mr. Davidson in the past thought Mr. Davidson was lying or malingering, Dr. Brown believed these people had misconstrued Mr. Davidson's responses to questions because Mr. Davidson's thinking was disorganized and he was highly prone to suggestion.

Post-conviction counsel also enlisted the services of a mitigation investigator, Vickie Harden, who submitted a report on July 5, 2006. Ms. Harden concluded that Mr. Davidson's case contained "an extraordinary number of pertinent issues from which to establish mitigating factors," and that this evidence was presented "either in a cursory manner or not presented at all during the trial of this case:"

> At the sentencing trial, despite the fact that the State presented Mr. Davidson's criminal history, the defense did not present Jerry Davidson's extensive history of mental illness, alcohol and drug use, long-standing patterns of symptoms and behaviors related to the mental health conditions, academic failures, and other relevant family history. Additionally, no neuropsychological testing was completed although the defense attorneys retained a neuropsychologist, Dr. Pamela Auble.

In light of the evidence that defense counsel possessed before trial, the cursory investigations done by Dr. Auble and Ms. Shettles, and in light of the later diagnoses of Drs. Spica and Brown, we now turn to the question of whether counsel's performance in relation to the sentencing hearing fell short of professional norms and prejudiced their client.

**IV.**

We now summarize the applicable law and apply it to Mr. Davidson's post-conviction claim.

**A.**

To determine whether Mr. Davidson was deprived of the effective representation of counsel at his sentencing hearing, we have distilled from recent United States Supreme Court case law the following principles that are specific to mitigation at capital sentencing.

-17-

Capital defendants possess a constitutionally protected right to provide the jury with mitigation evidence that humanizes the defendant and helps the jury accurately gauge the defendant's moral culpability. *Porter v. McCollum*, 558 U.S. at 41; *Williams v. Taylor*, 529 U.S. at 393. Accordingly, capital defense attorneys have an obligation to conduct a thorough investigation of the defendant's background. *Williams v. Taylor*, 529 U.S. at 396. Defense counsel should make an effort to discover all reasonably available mitigating evidence and all evidence to rebut any aggravating evidence that the State might introduce. *Wiggins v. Smith*, 539 U.S. at 524.

To provide effective representation, counsel must make either a reasonable investigation or a reasonable decision that particular investigations would be unhelpful or unnecessary. *Wiggins v. Smith*, 539 U.S. at 521. Either way, counsel's decision must indicate a reasoned strategic judgment. *Wiggins v. Smith*, 539 U.S. at 526. Defense counsel should investigate the defendant's medical history, educational history, employment and training history, family and social history, adult and juvenile correctional experiences, and religious and cultural influences. *Wiggins v. Smith*, 539 U.S. at 524.

Counsel is not required to investigate every conceivable line of mitigating evidence, no matter how unlikely it is to help the defense. Nor must counsel present mitigating evidence in every case. But "strategic choices made after less than complete investigation are reasonable only to the extent that reasonable professional judgments support the limitation of the investigation." *Wiggins v. Smith*, 539 U.S. at 533 (internal quotation marks omitted). To determine whether counsel's actions were reasonable, a reviewing court should "consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. at 527.

If the reviewing court finds that counsel was deficient, then the "prejudice" prong of *Strickland* depends on whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. To assess the probability of a different outcome, a reviewing court should consider the totality of the available mitigation evidence – including evidence known before trial and evidence discovered by post-conviction counsel. *Sears v. Upton*, 130 S. Ct. at 3266-67.

To guide this analysis, this Court has identified three factors that are significant for determining whether counsel's deficient presentation of mitigation evidence prejudiced a capital defendant. Reviewing courts should consider (1) the nature and extent of the mitigating evidence that was available but not presented; (2) whether substantially similar mitigating evidence was presented to the jury in either the guilt or penalty phase of the proceedings; and (3) whether there was such strong evidence of aggravating factors that the

mitigating evidence would not have affected the jury's determination. *Nichols v. State*, 90 S.W.3d 576, 598 (Tenn. 2002) (quoting *Goad v. State*, 938 S.W.2d at 371).

**B.**

We find that Mr. Davidson's trial attorneys were deficient in their investigation and presentation of mitigating evidence. While it was reasonable for defense counsel to refrain from discussing Mr. Davidson's psychological diagnoses during the guilt phase of trial, counsel's failure to shine any light on their client's mental deficiencies during the sentencing phase deprived Mr. Davidson of his right to present all relevant mitigation evidence.

Before trial, counsel possessed several decades worth of TDOC Records that habitually characterize Mr. Davidson as mentally ill. These records describe Mr. Davidson as having "a rather serious defect of judgment," "a remarkable lack of insight into his behavior," "severe psychotic disturbance," and "difficulties controlling his impulses." The TDOC Records allude to a diagnosis of "undifferentiated schizophrenia" when Mr. Davidson was a teenager. Before trial, counsel also possessed Mr. Davidson's records from MTMHI, which document his abnormal CT and EEG scans. The mitigation specialist Ms. Shettles read many of these records and alerted counsel that these documents contained useful mitigation evidence. But counsel kept this information to themselves.

Before trial, counsel possessed Dr. Auble's report in which she noted Mr. Davidson's "long history of mental illness" and tentatively diagnosed Mr. Davidson as suffering from "adjustment disorder with anxiety in a schizotypal personality disorder." Dr. Auble's report noted Mr. Davidson's "potential for psychotic episodes under stress," and opined that his cognitive difficulties prevented him from relating to other people and from accurately perceiving situations. Dr. Auble's report also noted Mr. Davidson's "troubled" childhood and difficulties in school. But Dr. Auble did no neuropsychological testing and was never called to testify.

Post-conviction counsel, with the help of Drs. Spica and Brown and mitigation specialist Ms. Harden, followed up on these leads. Drs. Spica and Brown opined that Mr. Davidson had the reasoning skills of a nine- or ten-year-old. They also believed that the MTMHI Records showed that Mr. Davidson's brain had atrophied. Drs. Spica and Brown diagnosed Mr. Davidson with a frontal lobe dysfunction, and Dr. Brown described Mr. Davidson's social and emotional development as stunted. Ms. Harden uncovered an "extraordinary" amount of mitigation evidence, most of which was not presented at trial. If counsel had used their neuropsychologist and mitigation specialist effectively, they also could have uncovered and utilized this information. *See Porter v. McCollum*, 558 U.S. at 36 (noting that the defendant, like Mr. Davidson, was found by the post-conviction

-19-

neuropsychologist to be someone who "suffered from brain damage that could manifest in impulsive, violent behavior").

First, we agree with the Court of Criminal Appeals that counsel made a reasonable tactical decision to abstain from presenting psychological evidence during the guilt phase of trial. *Davidson v. State*, 2013 WL 485222, at *19-20. Counsel was legitimately concerned that presenting any psychological evidence could open the door for the State to show the jury the alarming statements from Mr. Davidson's mental health records that revealed his malignant misogyny and his propensity to commit sexual violence. Ensuring that this evidence remained inadmissible was a reasonable strategy.

However, "[t]here is a world of difference between a decision not to introduce evidence at the guilt phase of a trial and a failure to investigate mitigating evidence that might be admissible at the penalty phase." *Wood v. Allen*, 558 U.S. 290, 305 (2010) (Stevens, J., dissenting). And a "cursory investigation" does not "automatically justif[y] a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy." *Wiggins v. Smith*, 539 U.S. at 527.

Despite the damaging nature of the evidence in Mr. Davidson's records, we find that defense counsel violated professional norms when counsel failed to inform the jury – at sentencing – of Mr. Davidson's brain damage and cognitive disorders. In *Williams*, the Supreme Court noted that not all of the unutilized evidence was favorable to the defense. *Williams v. Taylor*, 529 U.S. at 396. Mr. Williams had "a record of violent conduct that could have been introduced by the State." *Wiggins v. Smith*, 539 U.S. at 537. Similarly, the United States Supreme Court in *Sears* found it "unsurprising" that post-conviction counsel discovered "adverse evidence" in the defendant's records. However, the Court believed that counsel could have turned that evidence "into a positive," and presented a "cognitive deficiency mitigation theory." *Sears v. Upton*, 130 S. Ct. at 3264.

Similarly, Mr. Davidson's counsel could have used their client's threatening statements about raping women to illustrate his cognitive deficiencies. The post-conviction experts Drs. Spica and Brown explained how Mr. Davidson's violent history and disturbing fantasies revealed the woundedness of his ramshackle mind. Had Dr. Auble been given Mr. Davidson's MTMHI Records and adequate time to conduct neuropsychological testing, she could also have discovered before trial that Mr. Davidson had the executive function of a fourth grader, and she could have framed his chilling statements about women in the context of his troubled past and his misshapen psyche. The records that defense counsel possessed pre-trial (including the CT and EEG reports from MTMHI) raised clear red flags that Mr. Davidson's mental functioning and social capabilities were quite impaired. Counsel's failure

to develop this line of evidence does not strike us as a reasonable determination that further investigation would have been fruitless. The problem, rather, was inattention and a disturbing lack of time and resources.

Although we began with the presumption that trial counsel rendered effective assistance, we find that this presumption has been rebutted in Mr. Davidson's case. Although his attorneys' caseload was lamentable, counsel's investigation and presentation of mitigation evidence fell short of competence demanded of attorneys in criminal cases. Counsel held in their hands compelling evidence that Mr. Davidson has a broken brain and a tragic past. Their failure to submit any of this neuropsychological evidence to the sentencing jury falls short of the professional norms that prevailed at the time of trial.

We are not persuaded by the State's argument that presenting mental health mitigation evidence would contradict defense counsel's chosen theory of residual doubt. As illustrated by *Rompilla v. Beard,* a mental health mitigation case and a residual doubt argument are not mutually exclusive. *See Rompilla v. Beard*, 545 U.S. 374, 378, 386, 389-90 (2005) (reversing for failure to present mitigation evidence when the defense theory at sentencing was "residual doubt"). Because mental illness can render a defendant less morally blameworthy, capital defense attorneys who possess compelling evidence of mental defects have an obligation to make a reasonable and fully-informed decision about presenting that evidence to the jury. Counsel's decision in this case was less than reasonable and fully-informed.

We are likewise not persuaded by the State's argument that opening the door to Mr. Davidson's mental health records would be a two-edged sword that hurt Mr. Davidson at sentencing more than it helped. By the time of the sentencing hearing, the jury was already exposed to the State's aggravation evidence that Mr. Davidson had prior convictions for assault and battery with intent to rape in 1971; felonious crime against nature in 1983; felonious sexual battery in 1983; and assault and battery with intent to ravish and to have unlawful carnal knowledge of a female over twelve years of age in 1976. The jury therefore already knew Mr. Davidson had a long history of sexual violence against women. The evidence from Mr. Davidson's mental health records held little potential to demean him further in the jury's eyes. However, it had great potential to help explain the invisible mental machinations that made him behave this way. Keeping Mr. Davidson's brain damage, cognitive disorders, and mental illnesses secret under these circumstances was deficient performance.

We also find that counsel's deficient performance prejudiced Mr. Davidson at his capital sentencing hearing. Much like *Sears v. Upton*, although the evidence of Mr. Davidson's profound personality disorder might not have made him "any more likable to the

jury," the evidence could very well have helped the jury understand how Mr. Davidson could have committed "such horrendous acts." *Sears v. Upton*, 130 S. Ct. at 3264. An effective defense could have contextualized Mr. Davidson's prior hair-curling statements about women. *See Sears v. Upton*, 130 S. Ct. at 3264 (explaining that competent counsel can turn "adverse evidence" into something positive, such as "a cognitive deficiency mitigation theory"). Instead, the jury heard little that would "humanize" Mr. Davidson or help the jury "accurately gauge his moral culpability." Had his counsel been effective, the jury would have learned of the "kind of troubled history" that is "relevant to assessing a defendant's moral culpability.'" *Porter v. McCollum*, 558 U.S. at 41 (quoting *Wiggins v. Smith*, 539 U.S. at 535).

We cannot escape the fact that "the available mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of [Mr. Davidson's] moral culpability" and led to a sentence less than death. *Wiggins v. Smith*, 539 U.S. at 538 (quoting *Williams v. Taylor*, 529 U.S. at 398). At least one member of the jury could have decided that Mr. Davidson was less morally blameworthy (and thus undeserving of death) in light of his lifelong history of psychosis, his frontal lobe dysfunction, and the fact that his mental functioning was in some respects equivalent to that of a nine- or ten-year old child. These post-conviction revelations sufficiently undermine our confidence in the verdict to merit post-conviction relief. We find a reasonable probability that, but for counsel's failure to present psychological mitigation evidence, the result of the sentencing trial would have been different.

We have considered the nature and extent of the mitigating evidence that was available but not presented, and find the evidence to be voluminous and compelling. We have considered whether substantially similar mitigating evidence was presented to the jury, and find that it was not. We have considered whether there was such strong evidence of aggravating factors that the mitigating evidence would not have affected the jury's determination, and have decided that evidence illuminating Mr. Davidson's mental health issues could have colored the jury's consideration of the aggravating factors in a way that favored Mr. Davidson. *See Nichols v. State*, 90 S.W.3d at 598; *Goad v. State*, 938 S.W.2d at 371. Counsel's deficient performance therefore prejudiced Mr. Davidson.

Because Mr. Davidson was denied his right to effective assistance of counsel at his capital sentencing hearing, we remand his case to the trial court for re-sentencing.

## V.

We have concluded that Mr. Davidson's trial attorneys' representation fell short of prevailing professional norms and prejudiced Mr. Davidson's defense. Counsel

impermissibly failed to expose the sentencing jury to any of the highly relevant psychological mitigation evidence they had at their fingertips. In all other respects, we affirm and adopt the reasoning of the Court of Criminal Appeals. The judgment of the Court of Criminal Appeals is affirmed in part and reversed in part. Although we uphold Mr. Davidson's convictions, we remand for a new capital sentencing hearing, should the State decide to seek one. We assess the costs of this appeal to the State of Tennessee.

_____

WILLIAM C. KOCH, JR., JUSTICE