IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs May 2, 2018

**RAPHAEL LOVE v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 05-08431        Paula L. Skahan, Judge**

_____

**No. W2017-01515-CCA-R3-PC**

_____

Petitioner, Raphael Love, appeals the denial of his petition for post-conviction relief. Petitioner argues that he received ineffective assistance of counsel. After a review of the record and the briefs of the parties, we determine Petitioner has failed to establish that he received ineffective assistance of counsel. Accordingly, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ALAN E. GLENN and J. ROSS DYER, JJ., joined.

Ernest J. Beasley (on appeal) and Paul Guibao (at hearing), Memphis, Tennessee, for the appellant, Raphael Love.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Pam Stark, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Over thirteen years ago, Petitioner and two of his friends shot and killed Jessica Sisson and David McVay, innocent bystanders to an act of revenge orchestrated by the Petitioner. *State v. Rapheal Love*, No. W2007-01635-CCA-R3-CD, 2008 WL 3892020, at *1 (Tenn. Crim. App. Aug. 21, 2008), *no perm. app. filed*. Petitioner was only sixteen years old at the time of the offense. *Id.* According to Petitioner, three men fired shots at Petitioner earlier in the evening as a part of a long running feud. *Id.* Petitioner sought out the men in an effort to retaliate. *Id.* After finding the men in a crowd on the street, a

confrontation led to Petitioner and his friends firing their guns multiple times. *Id.* Bullets fired from the weapons held by Petitioner and his friends struck and killed the victims, not the men who were the targets of Petitioner's revenge. *Id.* at 2.

Testimony from the post-conviction hearing revealed that the investigation into the death of the victims led the police to Petitioner. The police arrested Petitioner in the presence of Natalie Love-Streeter, his cousin and legal guardian. Ms. Love-Streeter claimed she told Petitioner not to say anything to the police and that they had to get a lawyer. Subsequently, the police took Petitioner to the police station. While already on her way to the police station for a different matter, Clara Easley, Ms. Love-Streeter's mother and Petitioner's former guardian, received a call from Ms. Love-Streeter telling her that Petitioner had been taken into custody. When Ms. Easley arrived at the police station, she spoke with a detective who asked if she wanted to speak with Petitioner.

According to Petitioner, the police attempted to get him to make a statement "[t]hree to four" times before he finally made a statement. Some communications were held between Petitioner and the police with Ms. Easley as the intermediary. Eventually, Ms. Easley held a private conversation with Petitioner and encouraged him to make a statement. Ms. Easley told Petitioner "[t]o tell the truth." At no point did Petitioner consult an attorney or obtain representation by an attorney. After receiving encouragement from Ms. Easley, Petitioner gave a statement to the police. Ms. Easley remained with Petitioner as he gave his statement. However, Ms. Easley had no experience with the police or the effects of statements given to them. When Ms. Love-Streeter arrived at the police station, a police officer informed her that Petitioner was already making a statement.

Petitioner admits that he received no promises from the police in exchange for his statement, and this was not Petitioner's first time dealing with the police because he had been arrested for truancy and unlawful possession of a weapon in the past. However, this was Petitioner's first time giving a formal statement, and Petitioner claims he did not fully understand his rights at the time he gave his statement. Though he was sixteen years old, Petitioner had advanced to only the ninth grade in school because he had been held back twice due to his grades. Petitioner "admitted his involvement" with the crime in the statement. According to Petitioner, he "admitted being there and being the shooter[.]"

After Petitioner made a statement to the police, he was charged with two counts of murder. Petitioner's case began in juvenile court but was eventually transferred to Shelby County Criminal Court in January of 2007. Petitioner's trial date was set for May of 2007. Trial counsel, a Shelby County Assistant Public Defender, was appointed to represent Petitioner. In the period of time between the initiation of the case and Petitioner's trial date, Petitioner met with trial counsel "four or five times, face to face."

Trial counsel did not recall anything occurring in those meetings that would have led him to believe that Petitioner could not understand him. Trial counsel testified, "If in my communications with a client, if I feel like he or she doesn't understand me, or there's some kind of serious communication problem, usually I'll try to dig a little bit deeper, try to find out what is going on."

During his conversation with trial counsel, Petitioner made trial counsel aware that Ms. Love-Streeter had instructed the police not to talk to Petitioner until she had hired a lawyer for him. Petitioner was aware of trial counsel speaking with Ms. Love-Streeter and Ms. Easley. However, Ms. Love-Streeter claimed that she called trial counsel every day, and none of those calls were returned. She first spoke with trial counsel on the day after Petitioner was arrested, and the next time that Ms. Love-Streeter spoke with trial counsel was on the day of trial. Also, Ms. Easley recalled reaching out to trial counsel "several times," but she never spoke with him until Petitioner's court date.

Trial counsel advised Petitioner that if he testified at trial, he would be subject to cross-examination by the State. As a result, trial counsel told Petitioner that his testimony "wouldn't be good." However, Petitioner knew it was exclusively his decision to testify or refrain from testifying.

As a means of conveying Petitioner's story to the jury, trial counsel believed Petitioner's statement was "better than anything else." So, trial counsel made a strategic decision to not object to its admission. At no point in all of trial counsel's conversations with Petitioner did Petitioner mention that he had been forced to talk to the police, and according to trial counsel, if he "had thought, from [their] conversation that [Petitioner] had been coerced to make that statement, [he] probably would have filed a motion to suppress." To trial counsel's knowledge, there was no requirement that anyone be present with a juvenile while making a statement to the police. Furthermore, Petitioner had told trial counsel that his statement to the police was true. However, Petitioner claimed he made trial counsel aware of his desire to challenge the admissibility of his statement.

Trial counsel brought on co-counsel, another Shelby County Assistant Public Defender, to aid him during the trial. Co-counsel became second chair on the case just before trial, and Petitioner first met co-counsel on the second day of his trial. As far as co-counsel could recall, his involvement in the case did not include any pre-trial investigation, motions filed with the trial court, or communication with the client. Co-counsel described his job as taking notes and making missed objections at trial.

On the weekend before Petitioner's trial, co-counsel focused on the typewritten statement that Petitioner gave to the police. Co-counsel noted that Petitioner did not allege "improper pressure" or "intimidation" by the police. Co-counsel recalled that, on

three different occasions, the police left Petitioner alone with Ms. Easley for a private conversation prior to giving the statement. According to co-counsel, the police made it clear that "all [Petitioner] had to do [was] just let them know that he didn't [want to] talk anymore and it's over, no more talking." However, Petitioner's age at the time of the statement — sixteen years old — "jumped out" at co-counsel.

As co-counsel understood it, Petitioner's statement essentially said that he did not mean to hurt anyone, only to scare them. Co-counsel opined about the statement as follows:

> [Petitioner] never in the statement said he was trying to kill anybody, or anything of that nature[,] and I knew the driver of the car and the passenger of the car . . . had testified at another one of his co-defendants trial earlier, so that he was going to be put at the scene. So his statement, in my opinion and in [trial counsel's] opinion, . . . was helpful to [Petitioner], in that, he didn't admit to any kind of intent to kill, or anything of that nature.

After forming that opinion of the statement, trial counsel and co-counsel decided a motion to suppress would be frivolous.

On the day of trial, Petitioner's statement was read to the jury. Co-counsel believed that "[Trial counsel] and I told [Petitioner] when it came down to decision time [about] whether or not to testify, that the statement that had been read to the jury, we thought was helpful to him and we didn't think that it was a good idea that he try to match wits with [the district attorneys general]." Co-counsel described the cross-examination style of the district attorneys general as "aggressive." Co-counsel remembered trial counsel explaining the pros and cons of testifying to Petitioner. In co-counsel's opinion, there were no pros. However, neither trial counsel nor co-counsel pressured Petitioner to not testify. According to co-counsel, Petitioner's statement was in line with their defense strategy and mitigated the need for Petitioner's testimony.

At trial, Petitioner's statement was used against him. Ultimately, the jury convicted Petitioner of two counts of first degree murder. *Rapheal Love*, 2008 WL 3892020, at *2. At a sentencing hearing, the trial court order Petitioner to serve consecutive terms of life in prison. *Id.*

Petitioner filed a petition for post-conviction relief. Eventually, the post-conviction court held a hearing at which the aforementioned facts were adduced. In a written order entered on June 26, 2017, the post-conviction court found that Petitioner failed to prove that he was denied reasonably effective assistance of counsel and said "All of Petitioner's bases of relief, even if taken as true, would only amount to a questioning of counsel's trial strategy." Furthermore, the post-conviction court found that "most if

- 4 -

not all of Petitioner's allegations are untrue" and went on to reiterate that the few allegations which were true amounted to "a difference of opinion and second guessing of trial strategy." The post-conviction court held that Petitioner failed to prove that trial counsel was deficient and failed to show any prejudice.

Petitioner now appeals the judgment of the post-conviction court.[1]

*Analysis*

Petitioner argues that he received ineffective assistance of counsel because trial counsel lacked proper preparation for trial, failed to properly investigate the matter prior to setting a trial date, specifically Petitioner's education and mental health, and made no attempt to file a motion to suppress Petitioner's statement. The State contends that Petitioner's arguments are without merit because trial counsel strategically decided not to object to the admission of Petitioner's statement and trial counsel did not need to further investigate Petitioner's mental health after Petitioner showed no sign of inability to understand trial counsel and was determined to be competent to stand trial. We agree with the State.

Post-conviction relief is available for any conviction or sentence that is "void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. In order to prevail in a claim for post-conviction relief, a petitioner must prove his or her factual allegations by clear and convincing evidence. T.C.A. § 40-30-110(f); *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

Both the Sixth Amendment to the Constitution of the United States and article I, section 9 of the Tennessee Constitution guarantee the right of an accused to the effective assistance of counsel. *See Davidson v. State*, 453 S.W.3d 386, 392-93 (Tenn. 2014). In order to sustain a claim of ineffective assistance of counsel, a petitioner must demonstrate that counsel's representation fell below the range of competence demanded of attorneys in criminal cases. *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Under the two prong test established by *Strickland v. Washington*, 466 U.S. 668, 687 (1984), a petitioner must prove that counsel's performance was deficient and that the deficiency prejudiced

---

[1] We note that Petitioner untimely filed his notice of appeal on July 27, 2017. Because Tennessee Rule of Appellate Procedure 4(a) provides that the notice of appeal document is "not jurisdictional" and "may be waived in the interest of justice," we may waive the timeliness requirement after considering relevant factors such as the issues presented and the length of the delay. *See State v. Rockwell*, 280 S.W.3d 212, 214 (Tenn. Crim. App. 2007). Accordingly, we waive the timeliness requirement for the notice of appeal and address Petitioner's appeal on the merits.

the defense. *See State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel applied in federal cases also applies in Tennessee). Because a petitioner must establish both elements in order to prevail on a claim of ineffective assistance of counsel, "failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997). "Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 697).

The test for deficient performance is whether counsel's acts or omissions fell below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 688; *Henley*, 960 S.W.2d at 579. This Court must evaluate the questionable conduct from the attorney's perspective at the time, *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982), and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999). This Court will not use hindsight to second-guess a reasonable trial strategy, even if a different procedure or strategy might have produced a different result. *See Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). However, this deference to the tactical decisions of trial counsel is dependent upon a showing that the decisions were made after adequate preparation. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Even if a petitioner shows that counsel's representation was deficient, the petitioner must also satisfy the prejudice prong of the Strickland test in order to obtain relief. The question is "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). A petitioner must show that there is a reasonable probability "sufficient to undermine confidence in the outcome" that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Burns*, 6 S.W.3d at 463 (quoting *Strickland*, 466 U.S. at 694). "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* (quoting *Strickland*, 466 U.S. at 691).

Whether a petitioner has been denied the effective assistance of counsel presents a mixed question of law and fact. *Burns*, 6 S.W.3d at 461. This Court will review the post-conviction court's findings of fact "under a de novo standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise." *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001) (citing Tenn. R. App. P. 13(d); *Henley*, 960 S.W.2d at 578). This Court will not re-weigh or re-evaluate the evidence presented or substitute our own inferences for those drawn by the trial court. *Id.*

at 456.  Questions concerning witness credibility, the weight and value to be given to testimony, and the factual issues raised by the evidence are to be resolved by the post-conviction court.  *Id.*  However, the post-conviction court's conclusions of law and application of the law to the facts are reviewed under a purely de novo standard, with no presumption of correctness.  *Id.* at 458.

First, we will address the investigation and preparation of trial counsel and co-counsel.  In this case, trial counsel had Petitioner undergo a mental evaluation to determine if Petitioner was competent to stand trial.  The results revealed that Petitioner was competent.  In the four to five in-person meetings between Petitioner and trial counsel, trial counsel did not develop any suspicions of a mental defect or an inability to communicate with Petitioner.  Additionally, co-counsel noted no signs of an inability to communicate with them.  With no signs of impairment and a mental evaluation stating Petitioner was competent to stand trial, we conclude that trial counsel and co-counsel were not deficient and performed within the range of competence demanded of attorneys in criminal cases when they proceeded to trial without further investigation into Petitioner's education or mental health.

Next, we turn to Petitioner's statement.  Both trial counsel and co-counsel agreed that Petitioner's statement could be used to benefit Petitioner by conveying his side of the story to the jury without risking the perils of cross-examination.  Co-counsel even testified that he spent the entire weekend before trial focused on the admissibility of Petitioner's statement.  After determining that a motion to suppress Petitioner's statement would be "frivolous," trial counsel and co-counsel decided not to object to its admission.  This is exactly the type of "reasonable trial strategy" that we will not second guess.  Trial counsel and co-counsel adequately considered the pros and cons of not objecting to Petitioner's statement and made a strategic or tactical decision not to object to its admission.  As such, we cannot conclude that trial counsel or co-counsel performed deficiently, nor can we conclude that Petitioner received ineffective assistance of counsel.

*Conclusion*

For the aforementioned reasons, we affirm the judgment of the post-conviction court.

_____
TIMOTHY L. EASTER, JUDGE