IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 12, 2019

## DAVID WI v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Montgomery County**
**No. 63CC1-2016-CR-292   William R. Goodman, III, Judge**

_____

## No. M2018-00671-CCA-R3-PC

_____

Petitioner, David Wi, pled guilty to aggravated burglary, felony murder, attempted first degree felony murder, attempted first degree premeditated murder, conspiracy to commit first degree murder, and aggravated assault in exchange for a sentence of life plus twenty-five years.  Petitioner subsequently filed a petition for post-conviction relief and alleged that he received ineffective assistance of counsel and that his guilty pleas were not knowing and voluntary.  The post-conviction court denied relief.  After a review, we affirm the judgment of the post-conviction court on the issues of ineffective assistance of counsel and the knowing and voluntary nature of Petitioner's guilty plea.  However, we must reverse Petitioner's conviction for attempted first degree felony murder and dismiss Count Five of the indictment because Count Five of the indictment fails to state an offense.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in part and Reversed in part**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER., JJ., joined.

Gregory D. Smith, Clarksville, Tennessee, for the appellant, David Wi.

Herbert H. Slatery III, Attorney General and Reporter; Alexander C. Vey, Assistant Attorney General; John W. Carney, Jr., District Attorney General; and Arthur Bieber, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

*Factual and Procedural Background*

As the factual basis of the plea, the State offered an October 4, 2015 shooting in Montgomery County where Brandon Jiminez[1] and a two-year-old minor male victim, the son of Petitioner's wife, were shot. On this particular day, Petitioner's wife, Petitioner's daughter, Petitioner's mother-in-law, and the minor male victim were at the home of Mr. Jiminez. Mr. Jiminez answered a knock on the door of his apartment, and a man greeted him asking for jumper cables. When Mr. Jiminez declined the man's request, the man pulled out a gun and began firing. Mr. Jiminez fell to the floor, and the man walked past him and fired several shots as he went down the hallway, including firing shots into the room where Petitioner's wife and daughter were hiding. As the man was leaving, the minor male victim began to cry. Hearing this cry, the man walked deeper into the home and fired more shots. Mr. Jiminez was seriously injured and transported via life flight to Vanderbilt Hospital, and the minor male victim died as a result of a gunshot to the back of the head.

During his interview at the hospital, Mr. Jiminez recalled seeing a red or burgundy Impala on the evening of the shooting, and he recalled that the man who committed the shooting had come by the apartment the day before to ask for directions. Bullets from the shooting matched a pistol recovered from a vehicle owned by Zachary Alexander, and DNA analysis revealed that blood from the scene, which had not matched any of the victims, matched Mr. Alexander. Phone records revealed that Mr. Alexander and Petitioner had communicated before and after the shooting, and a field book recovered from Mr. Alexander's vehicle contained pages labeled "Wi's plan." The plan contained notes about life insurance, the need for a body, and the date on which the crime was to be committed, October 4th. A different page contained a hand drawn map labeled "Wi's crib."

While in jail, Petitioner wrote a letter to another inmate describing the crime and detailing his motive. In the jail letter, Petitioner wrote the following:

> First of all I never asked him to kill [the minor male victim]. He was only supposed to take out my ole lady, Alicia [and] her boyfriend if he got in the way. I didn't want anyone else in the house to die. Not even Rachel[, Alicia's mother,] because I didn't want [the minor male victim] to go into foster care. But what I think happen was, he knew I have life insurance on [the minor male victim], so after he shot the boyfriend, he couldn't find anyone else but the boy. He couldn't find Alicia, and he wanted to get paid so he shot [the minor male victim]. When he told me he shot him, I flipped

---

[1] The indictment refers to "Brandon Jiminez," and the transcript of the guilty plea hearing refers to "Brandon Jimenez." For consistency, we will use the spelling from the indictment.

out [and] asked him why. He just kept saying IDK, IDK, IDK, it was an accident. By the way, I didn't go in the house. I waited in the car. And he never saw Rachel. She hid in the bathroom the whole time. . . .

At Petitioner's guilty plea hearing, Petitioner was placed under oath, and the trial court directly questioned him. Petitioner testified that he understood the agreement and that he did not contest any of the facts alleged by the State. Petitioner testified that he had read the plea agreement. Petitioner testified that he had reviewed the agreement with his attorney and that he was satisfied with his attorney's representation. The trial court went over each crime to which Petitioner would be pleading, stating the offense classification, the range of punishment, and release eligibility percentage associated with each offense. Then, the trial court asked Petitioner, "[A]re you in fact guilty of" each offense to which Petitioner was pleading guilty, and Petitioner answered affirmatively. Additionally, the trial court explained the consecutive and concurrent alignment of Petitioner's sentences that added up to a total effective sentence of life plus twenty-five years.

Later, Petitioner filed a petition for post-conviction relief alleging that he received ineffective assistance of counsel and, as a result, his pleas were not knowing and voluntary. Petitioner testified at the post-conviction hearing and gave the following account of his representation. Petitioner recalled that he was indicted for "11 or 12 counts" that included charges of "[f]irst degree murder, felony murder, attempted murder, . . . aggravated burglary, aggravated assault." The trial court appointed trial counsel to represent Petitioner.

At the post-conviction hearing, Petitioner testified that a little more than a year passed between Petitioner's arrest and the entry of his plea. Though Petitioner had very little experience with the court system and lawyers, the gravity of the charges against Petitioner became apparent to him rather quickly. The amount of Petitioner's bond and the period of time he was told to expect to be in jail before trial indicated to him that his charges were very serious.

Petitioner believed that he and trial counsel met in person twice and that they met via video conference "maybe, two, three times max." Petitioner recalled the in-person meetings lasting around fifteen minutes. According to Petitioner, the first in-person meeting between Petitioner, trial counsel, and an investigator consisted of trial counsel asking for Petitioner's story and fielding Petitioner's questions. Petitioner stated that his video conferences with trial counsel usually lasted around five minutes, but a few lasted approximately fifteen minutes. Petitioner estimated that his total time spent with trial counsel prior to the entry of the guilty plea was approximately two hours. Petitioner met with the investigator more than he met with trial counsel. Petitioner's meetings with the investigator lasted around fifteen minutes.

Petitioner claimed that during these meetings, trial counsel went over the indictment but did not explain each individual count. He said trial counsel did not discuss the elements of the charged crimes, the possible punishments for each individual offense, or the lesser included offenses of the charged crimes. Trial counsel sent a discovery packet to Petitioner, but in Petitioner's words, "we never really went into it and discussed what was in it." However, the county jail prohibited Petitioner from receiving the compact discs contained in the discovery, and Petitioner only had "a little over a thousand pages" of the discovery that contained "thousands" of pages. Petitioner could not recall if he had the entire discovery packet before he pled guilty. Petitioner claimed that he did not specifically discuss any of the discovery materials with trial counsel. Also, Petitioner felt that he did not have the opportunity or time to discuss the discovery with trial counsel, but Petitioner did not remember asking for more time to discuss things with trial counsel. Petitioner reached out to trial counsel multiple times, and trial counsel responded via mail.

The breaking point in Petitioner's case came when the prosecutor sent trial counsel the letter written by Petitioner about the crime that was found in another inmate's jail cell. According to Petitioner, the investigator delivered a message to him from trial counsel that said, "shut the f**k up" and "nice job ensuring your conviction." Defenses were not discussed after this point. Petitioner said that no discussions were had about suppressing the letter or preparing for trial.

The discovery of the letter prompted Petitioner and trial counsel to discuss the death penalty. Petitioner was aware that no death penalty notice had been filed by the State, but he was unaware that the State had to file a death penalty notice before the State could pursue that punishment. Petitioner was also unaware that the death penalty notice had been filed in his co-defendant's case. Petitioner said, "I assumed that . . . if I was found guilty that I would be sentenced with the death penalty." Petitioner claimed there was no discussion with trial counsel about the sentencing phase of a criminal prosecution. Petitioner and trial counsel never discussed an exact number of years that Petitioner would be facing if he pled guilty. However, Petitioner testified that trial counsel told him that the State was going to pursue the death penalty against him. When describing his state of mind during the plea negotiations, Petitioner said, "I was pretty much willing to do anything to not get the death penalty."

Trial counsel sent Petitioner a letter detailing the State's plea offer, but Petitioner did not discuss the plea offer with trial counsel until the day of the plea hearing. The first time that Petitioner actually saw his petition to plead guilty was on the day of the plea hearing. Petitioner read the plea petition on his own in the "roughly 30[ ]minutes" between his receipt of the plea petition and the beginning of the hearing. Petitioner maintained that trial counsel did not review the contents of the plea petition with him.

- 4 -

Petitioner was uncomfortable with this situation, but he was afraid that he would receive the death penalty if he did not go forward with the plea. Petitioner felt as though he had unanswered questions, but he recognized that trial counsel advised him that pleading guilty was the better option in his case.

Petitioner recounted the trial court going over his rights during the plea hearing, and Petitioner told the trial court that he had no questions regarding his rights. However, at the post-conviction hearing, Petitioner contended that he was never told that he could not be compelled to testify at his own trial. Petitioner added that he did not remember reading about that right in the plea petition either.

On cross-examination, Petitioner admitted that he never told trial counsel that he would rather go to trial than plead guilty. Furthermore, Petitioner admitted that trial counsel informed him of the State's offer two or three weeks before the entry of his plea.

Trial counsel had a different perspective on his representation of Petitioner. Trial counsel, a death penalty qualified defense attorney, had handled three death penalty cases in his career. Trial counsel documented nine different times that he met with Petitioner either in person or via video conference. At the outset of the case, trial counsel believed some defenses were available to Petitioner. Specifically, trial counsel believed the State would have trouble identifying Petitioner and that "the wife" looked like a really good suspect. However, trial counsel did not believe that these defenses were particularly strong.

Trial counsel explained that his method for handling cases such as Petitioner's was to meet with the client after indictment. He begins the meeting by asking the client if he or she has any questions. Then, he moves to his own questions. Trial counsel had no difficulties when communicating with Petitioner. Trial counsel stated that he would have gone over the possible punishments for each of Petitioner's indicted offenses. Trial counsel generally does not go over every element of each offense when meeting with clients. Instead, he only focuses on the issues which will be crucial to the outcome of the case. Trial counsel could not recall if he discussed lesser-included offenses with Petitioner.

According to trial counsel, Petitioner said at one of their very first meetings that he did not want to go to trial. Petitioner had questions about the death penalty. In response, trial counsel carefully explained that he only told Petitioner that he "may" face the death penalty, but he did not tell Petitioner that he "would" face the death penalty. No death penalty notice had been filed, and in trial counsel's experience, they were usually filed a few months after indictment. However, trial counsel had indications that the State was leaning toward pursuing the death penalty, and he had experience with the State using a death penalty notice as a negotiation tool. Trial counsel did not explain to Petitioner that

the guilt phase of trial would be bifurcated from the sentencing phase. When asked if he believed Petitioner pleaded guilty to avoid the death penalty, trial counsel said, "I believe he [pled] guilty because that was in his best interest to plead guilty for the offer that was accorded him."

Trial counsel believed that the police had put together a pretty good "bread crumb trail" leading to Petitioner. He characterized the State's circumstantial evidence as "pretty strong." The police had recovered a field notebook from the co-defendant that contained the victims' address written in Petitioner's handwriting. When the jail letter was discovered, trial counsel's view of Petitioner's case worsened.

After trial counsel received the jail letter from the prosecutor, he sent his investigator to go confront Petitioner with the letter at the jail because trial counsel was out of town. Trial counsel instructed his investigator to "tell him to shut up in soldierly terms, because, apparently, at that point professional terms weren't working." Trial counsel did not direct the exact language that he wanted his investigator to use. Instead, he used asterisks and ampersands to convey the language that he wanted the investigator to communicate to Petitioner. When confronted, trial counsel did not dispute that he instructed his investigator to tell Petitioner to "shut the f**k up, and nice job ensuring your conviction."

Trial counsel did not usually review the long form plea petition with his clients. In this case, Petitioner had the plea petition "several days in advance." Trial counsel fielded questions from Petitioner and had discussions about the plea with Petitioner. Trial counsel said, "If he asked me to discuss the plea agreement[,] we discuss[ed] it; if he did not, then no, we didn't." Trial counsel went on to say the following:

> [Petitioner] is not a stupid man. Right. He's smart. His conversations, when he asked me questions, were appropriate, probing and addressed the concerns that he had. He's not a stupid man. So, . . . when I went down there, [and] asked him if he has questions about stuff, I leave it to him to ask me those questions.

Specifically, trial counsel noted that Petitioner never asked about the State's ability to compel him to testify in his own trial.

At some point, trial counsel and the prosecutor exchanged texts about the case. Trial counsel expressed that Petitioner was interested in retaining private counsel if the case were to remain non-capital, and he inquired with the prosecutor if she intended to pursue the death penalty. The prosecutor stated that she considered the matter a "death case" and that she was authorized to pursue the death penalty. The prosecutor testified that she got closer to filing the death notice as the case went on. They had hoped to spare

the victim's family from the protracted litigation of a death penalty trial, but the prosecutor had authorization to file a death penalty notice and proceed to trial.

In its written order denying post-conviction relief, the post-conviction court found that the evidence at the hearing "did not support the premise that Petitioner did not have sufficient time to read, review, and question anything that he did not understand in the plea agreement," that the plea agreement advised Petitioner of his right "to remain silent and not testify at trial," and that there was "no basis to support the contention that Petitioner believed he could be forced to testify." Further, the post-conviction court found no merit in Petitioner's claims that trial counsel insufficiently communicated with Petitioner. Finding that neither deficiency nor prejudice, the post-conviction court determined that Petitioner had not received ineffective assistance and that Petitioner's plea was knowing and voluntary. It is from this order that Petitioner now appeals.

*Analysis*

*I. Standard of Review*

Post-conviction relief is available for any conviction or sentence that is "void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. In order to prevail in a claim for post-conviction relief, a petitioner must prove his factual allegations by clear and convincing evidence. T.C.A. § 40-30-110(f); *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998). On appeal, a post-conviction court's findings of fact are conclusive unless the evidence preponderates otherwise. *Vaughn v. State*, 202 S.W.3d 106, 115 (Tenn. 2006). Accordingly, questions concerning witness credibility, the weight and value to be given to testimony, and the factual issues raised by the evidence are to be resolved by the post-conviction court, and an appellate court may not substitute its own inferences for those drawn by the post-conviction court. *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001). However, the post-conviction court's conclusions of law and application of the law to the facts are reviewed under a purely de novo standard, with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

*II. Ineffective Assistance of Counsel*

Petitioner argues that trial counsel was ineffective when he allowed Petitioner "to plead guilty in a case when said plea was not fully knowing and voluntary." Essentially, Petitioner argues that trial counsel did not adequately communicate with Petitioner about his situation and the available options. The State argues that trial counsel's performance

was not deficient because he met with Petitioner multiple times, discussed Petitioner's case with him, and answered Petitioner's questions. Additionally, the State argues that Petitioner has not established prejudice because there is no evidence that Petitioner would have insisted upon a trial. We agree with the State.

Both the Sixth Amendment to the Constitution of the United States and Article I, section 9 of the Tennessee Constitution guarantee the right of an accused to the effective assistance of counsel. *See Davidson v. State*, 453 S.W.3d 386, 392-93 (Tenn. 2014). In order to sustain a claim of ineffective assistance of counsel, a petitioner usually must prove both that counsel's performance was deficient and that the deficiency prejudiced the defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Because a petitioner must establish both elements in order to prevail on a claim of ineffective assistance of counsel, "failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley*, 960 S.W.2d at 580. "Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 697).

The test for deficient performance is whether counsel's acts or omissions fell below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 688; *Henley*, 960 S.W.2d at 579. This Court must evaluate the questionable conduct from the attorney's perspective at the time, *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982), and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Burns*, 6 S.W.3d at 462; *see also Strickland*, 466 U.S. at 690 ("[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."). This Court will not use hindsight to second-guess a reasonable trial strategy, even if a different procedure or strategy might have produced a different result. *See Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). However, this deference to the tactical decisions of trial counsel is dependent upon a showing that the decisions were made after adequate preparation. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

In order to determine prejudice, the question is "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). As stated above, a petitioner must show that there is a reasonable probability "sufficient to undermine confidence in the outcome" that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Burns*, 6 S.W.3d at 463 (quoting *Strickland*, 466 U.S. at 694). "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."

*Id.* (quoting *Strickland*, 466 U.S. at 691). To establish prejudice in the context of a guilty plea, a petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

The evidence does not preponderate against the post-conviction court's finding that Petitioner's claims of insufficient communication were without merit. Trial counsel documented nine different times that he met with Petitioner either in person or via video conference. Additionally, the record contains four letters sent by trial counsel to Petitioner in order to keep him apprised of the status of his case. While trial counsel did not explain every element that the State was required to prove or the lesser-included offenses of the crimes charged, he did discuss the possible punishments for each of Petitioner's indicted offenses, which was the main focus of the plea negotiations. Trial counsel provided Petitioner with a copy of his plea petition weeks in advance of his hearing, but he did not go over the plea petition in a line-by-line fashion before the hearing. Nevertheless, Petitioner posed no questions to trial counsel about the plea petition. The biggest issue with regard to their communication appears to surround the State's death penalty notice, or lack thereof. Petitioner knew that the State had not filed a death penalty notice, but he did not know that notice was required before the State could pursue the death penalty. Petitioner assumed that if he were convicted at trial, then he would receive the death penalty. Indeed, trial counsel informed Petitioner that he "may" face the death penalty, but at the post-conviction hearing, trial counsel carefully explained that he used the word "may" rather than "would." It is not deficient performance when an attorney is not informed of and thus does not dispel a client's assumptions. Therefore, Petitioner did not receive ineffective assistance of counsel.

### III. Validity of Guilty Plea

Interwoven with Petitioner's claim of ineffective assistance of counsel is a claim that Petitioner's plea was not made knowingly and voluntarily.[2] The State responds that Petitioner knew the nature of his guilty plea and made a voluntary choice to plead guilty. We agree with the State.

To satisfy constitutional standards of due process, a guilty plea must be entered knowingly, intelligently, and voluntarily. *Boykin v. Alabama*, 395 U.S. 238, 243 (1969). When evaluating the knowing and voluntary nature of a guilty plea, the United States Supreme Court has held that "[t]he standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970). In making this

---

[2] Petitioner's claim that he was not properly advised of his right to remain silent and not testify at trial has been implicitly abandoned on appeal.

determination, the reviewing court must look to the totality of the circumstances. *See State v. Turner*, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995); *Chamberlain v. State*, 815 S.W.2d 534, 542 (Tenn. Crim. App. 1990). This Court may consider the following circumstantial factors:

> the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from trial.

*Blankenship v. State*, 858 S.W.2d 897, 905 (Tenn. 1993). "[A] plea is not 'voluntary' if it results from ignorance, misunderstanding, coercion, inducements, or threats." *Ward v. State*, 315 S.W.3d 461, 465 (Tenn. 2010). A defendant's solemn declaration in open court that his plea is knowing and voluntary creates "a formidable barrier in any subsequent collateral proceeding" because these declarations "carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977).

Defendant's intelligence is apparent. He is a high school graduate who attended a university for a short period of time before joining the military. While in the military, Petitioner served as a supply specialist who managed the equipment and property books for his outfit. He had no experience with the judicial system before this case, but he was represented by a well-seasoned attorney who adequately communicated with him about his options. Ultimately, it is obvious that Petitioner pled guilty to avoid the death penalty. Even though receiving the death penalty may not have been an inevitable outcome, as Petitioner had assumed, it was still a possibility. The prosecutor had the authority to file a death notice and considered Petitioner's case to be a "death case." The trial court thoroughly reviewed Petitioner's guilty plea with him, and Petitioner affirmed at the guilty plea hearing that he had read and understood the plea agreement, which informed Petitioner of all of his rights including the right to remain silent. Petitioner has failed to overcome the "strong presumption of verity" afforded to his declarations at the guilty plea hearing, and we conclude that his guilty plea was made knowingly and voluntarily.

### IV. Count Five of the Indictment

We have noticed a fatal flaw in Count Five of the indictment that has not been addressed by either party or the court below. This Court must consider whether the trial court had jurisdiction over the subject matter, regardless of whether it was presented as an issue for review. Tenn. R. App. P. 13(b). "A valid indictment is an essential jurisdictional element, without which there can be no prosecution." *Dykes v. Compton*,

978 S.W.2d 528, 529 (Tenn. 1998). Subject matter jurisdiction is not waived by a defendant's guilty plea. *State v. Yoreck*, 133 S.W.3d 606, 612 (Tenn. 2004). Thus, the waiver rule does not apply when an indictment fails to charge an offense. *State v. Perkinson*, 867 S.W.2d 1, 6 (Tenn. Crim. App. 1992). Moreover, subsequent proceedings are a nullity when the indictment fails to state an offense. *Id.*

"[T]he offense of attempted felony-murder does not exist in Tennessee." *State v. Kimbrough*, 924 S.W.2d 888, 892 (Tenn. 1996); *State v. Madkins*, 989 S.W.2d 697, 699 (Tenn. 1999). "[A] charge of 'attempted felony-murder' is inherently inconsistent, in that it requires that the actor have intended to commit what is deemed an unintentional act." *Kimbrough*, 924 S.W.2d at 890.

Count Five of the indictment alleges that Petitioner "did unlawfully attempt to commit the offense of First Degree murder against Brandon Jiminez, as defined in TCA 39-13-202(a)(2), during the perpetration of a felony or attempt to perpetrate a felony. . . ." Page two of Petitioner's plea petition states that Petitioner offered to plead guilty to "Count 5: Attempted first degree (felony) murder of Brandon Jiminez," and page three of Petitioner's plea petition sets forth the possible punishment for "[a]ttempted first degree (felony) murder of Brandon Jiminez." At the guilty plea hearing, the State announced the offense in Count Five as the "attempted first degree felony murder of Brandon Jimenez [sic]," and the trial court referenced "the attempted first degree felony murder of Brandon Jimenez (sic)" multiple times before ultimately asking, "Are you in fact guilty of the offense as charged in [C]ount [F]ive of the indictment of attempted first degree murder?" To which Petitioner responded, "Yes, sir." Ultimately, the judgment document for Count Five indicates "attempted first degree murder" and cites Tennessee Code Annotated section 39-13-202. The judgment document does not contain a reference to a subsection of section 39-13-202 unlike Count Five of the Indictment which references the subsection of the statute pertaining to felony murder. There is nothing in the record that indicates that the indictment was amended to attempted first degree *premeditated* murder before Petitioner entered his plea of guilt. In fact, only moments before the entry of Petitioner's plea, the trial court referred to the charge as "*attempted* first degree *felony murder*" (emphasis added).

We cannot ignore our supreme court's determination in *State v. Kimbrough* that "attempted felony murder" is not a cognizable crime. Because Count Five of the indictment alleges an attempted felony murder, which is not an offense in Tennessee, we must reverse Defendant's conviction in Count Five and dismiss Count Five of the indictment.

Ultimately, we determine that Count Five may be reversed and dismissed independently from the remaining convictions that resulted from Petitioner's guilty plea. An invalid portion of a guilty plea may be severed from the remaining convictions so

long as the invalid portion is not a material, bargained-for, element of the plea. *See David Wayne Britt v. Jerry Lester, Warden*, No. W2013-00148-CCA-R3-HC, 2014 WL 117423, at *3 (Tenn. Crim. App. Jan. 13, 2014), *perm. app. denied* (Tenn. May 15, 2014). A portion of a plea agreement is material when there is a reasonable probability that that outcome would be different in the absence of that portion. *See id.* (citing *Summers v. Fortner*, 267 S.W.3d 1, 6-7 (Tenn. Crim. App. 2008)). The reversal of Petitioner's conviction in Count Five will not affect Petitioner's total effective sentence because the twenty-five-year sentence for Count Five was concurrent with Petitioner's twenty-five-year sentence in Count Nine. Since Petitioner's stated reason for pleading guilty was that he wanted to avoid the death penalty, his plea to Count Five is not a material element of Petitioner's plea agreement. Therefore, all of Petitioner's convictions other than the conviction for Count Five will remain intact as well as his life (Count 2) plus twenty-five years (Count 9) sentence.

*Conclusion*

For the aforementioned reasons, we affirm the judgment of the post-conviction court.

_____
TIMOTHY L. EASTER, JUDGE