IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
May 24, 2022 Session

**MONTEZ DAVIS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Hamilton County
No. 291262   Barry A. Steelman, Judge**

——————————————————————

**No. E2021-00874-CCA-R3-PC**

——————————————————————

Petitioner, Montez Davis, was convicted of second degree murder, reckless endangerment, and unlawful possession of a weapon by a Hamilton County jury. *State v. Montez Davis*, No. E2011-02066-CCA-R3CD, 2012 WL 6213520, at *1 (Tenn. Crim. App. Dec. 13, 2012), *perm. app. denied* (Tenn. Apr. 10, 2013). The post-conviction court denied several of Petitioner's claims but ultimately granted post-conviction relief and vacated Petitioner's second degree murder conviction. The State appealed and Petitioner filed a cross-appeal. After a thorough review, we reverse the post-conviction court's grant of post-conviction relief and reinstate Petitioner's second degree murder conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and JILL BARTEE AYERS, J., joined.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Neal Pinkston, District Attorney General; and P. Andrew Coyle, Assistant District Attorney General, for the appellant, State of Tennessee.

Jonathan T. Turner (on appeal and at hearing), Chattanooga, Tennessee; and Ryan Wheeler (at hearing), Chattanooga, Tennessee, for the appellee, Montez Davis.

**OPINION**

The Hamilton County Grand Jury indicted Petitioner for first degree murder, reckless endangerment, and unlawful possession of a weapon after Petitioner fired at least three bullets into a crowd of people at a gas station, killing one individual. *Id.* at *11.

On January 9, 2010, several individuals and cars were at a gas station after a high school basketball game ended. *Id.* at *3. One witness testified that she saw "a group of [10] to [15] males dressed in red and white clothing" at the gas station. *Id.* at *6. There was a shooting at the gas station. *Id.* at *3. Jonathan Lawrence, the victim, was shot and killed while pumping gas for a customer. *Id.* Shortly thereafter, another shooting occurred nearby at Petitioner's father's house. *Id.* at *4.

Detective Adam Emery of the Chattanooga Police Department arrived at the gas station. *Id.* He spoke with the store employees and viewed surveillance footage from the gas station. *Id.* Detective Emery testified that the video showed a white SUV drive across the parking lot. *Id.* Somebody moved toward the SUV and appeared to throw something at the vehicle. The SUV then drove "out of camera view, . . . and then, you know, 30 seconds or less, and then you see everybody scatter, so that's basically the video that I saw." *Id.* The shooting itself was off-camera. *Id.*

Detective Emery interviewed witnesses at the gas station and "[t]hrough his investigation, Detective Emery learned that [Petitioner] . . . was a potential suspect in the shooting at [the gas station]." *Id.* Detective Emery located Petitioner and conducted an interview. *Id.* During the interview, Petitioner initially stated that he pulled into the gas station after seeing his sister's car in the parking lot. *Id.* He said that "someone threw a bottle that broke a small window on the passenger side of [his] SUV[,]" and he drove off to his father's house. *Id.* Petitioner said that the passenger in his vehicle then pointed a gun outside the car window but that the passenger did not fire the gun. *Id.* Petitioner said he "zoomed off" because he heard gunshots. *Id.* Eventually, Petitioner admitted that "after someone hit the SUV with a bottle, he drove to the end of the parking lot, got out of the vehicle, and began shooting with a Glock .40 that he fired three times into the air." *Id.* Petitioner told Detective Emery he did not know who threw the bottle. *Id.* Detective Emery asked Petitioner where he aimed the gun, and Petitioner admitted that he fired the gun "[l]ike, towards the store. Like towards Russell and them. Whoever was standing out there." *Id.* He explained that he was angry because the "Bloods" constantly picked on him and he fired into the crowd because the passenger in his vehicle said "Russell" threw the bottle. *Id.* Petitioner said he noticed his sister in the crowd. *Id.* Petitioner said that when he shot into the crowd, he was firing at "Russell." *Id.* Petitioner's mother testified that Petitioner's education suffered because he "did not attend school often because he was being [']harassed by these guys[']." *Id.* at *6. Petitioner did not testify at his May 2011 trial. *Id.*

A jury convicted Petitioner of second degree murder, reckless endangerment, and unlawful possession of a weapon. *Id.* *1. Petitioner received an effective 21-year sentence. *Id.* Petitioner filed a direct appeal and raised three issues, one being that the evidence was insufficient to support his second degree murder conviction. *Id.* A panel of

this Court affirmed Petitioner's conviction, reasoning that the jury, "as was their right," convicted "[Petitioner] of second degree murder obviously rejecting [Petitioner]'s claim that he acted recklessly and not knowingly." *Id*. at *11. The supreme court denied permission to appeal.

On March 31, 2014, Petitioner filed a timely petition for post-conviction relief. In his petition, Petitioner raised eight claims of ineffective assistance of counsel. Through appointed counsel, Petitioner filed an amended petition for post-conviction relief. The State filed a response, denying Petitioner's allegations. Nearly six years later, the post-conviction court held a hearing on the petition for post-conviction relief.

Trial counsel recalled that he represented Petitioner sometime around 2010. Petitioner's mother retained trial counsel to represent Petitioner. Trial counsel testified that he had adequate time to prepare for the trial. Trial counsel recalled that in preparing Petitioner's defense, he and his paralegal visited the gas station where the shooting occurred and Petitioner's father's house nearby. Trial counsel reviewed the witnesses' statements and talked to a few witnesses. Trial counsel admitted he was unable to talk to some of the witnesses because "they didn't want to talk to [him.]" Trial counsel testified that he visited Petitioner in jail and frequently spoke with Petitioner's mother.

Trial counsel testified that he sought a ballistics expert but it was too expensive. Trial counsel researched the relevant legal arguments and motions and developed a theory for Petitioner's case. Trial counsel testified that he did not hire a private investigator. Trial counsel explained that he did not hire a private investigator because Petitioner confessed to the shooting at the gas station, changed his story "a couple times within the confession," and expressed remorse and regret. Based on Petitioner's confession, trial counsel did not believe an investigator or ballistics expert "would be necessary to address . . . what [Petitioner] was accused of having done." Trial counsel testified that all of the witnesses' statements placed Petitioner as the shooter at the scene.

Trial counsel testified that he attempted to contact one witness, Shamyra Smith, who told the police that another individual had a gun at the gas station. Trial counsel testified he was unable to reach Ms. Smith. Trial counsel explained that there was a gas station surveillance video of the people at the gas station, and the video did not show anyone firing a gun. Trial counsel recalled that Petitioner said someone threw a bottle at his car, and a bottle was recovered near his car.

Trial counsel said he elicited testimony during the trial from Detective Emery regarding Ms. Smith's statement that at least one other individual had a gun in the gas station parking lot. However, the trial court ruled that Ms. Smith's statement was inadmissible hearsay evidence.

- 3 -

Post-conviction counsel again asked trial counsel about hiring a ballistics expert. Trial counsel explained that he asked Petitioner if he had the funds to hire a ballistics expert and Petitioner said no. Trial counsel admitted that at the time, he did not know of the indigent defense fund or that he could have requested funding for expert services from the fund. Trial counsel confirmed that he identified two potential ballistics experts; however, their fees were too high. Trial counsel believed he contacted the Administrative Office of the Courts to ask for funds and looked up various ways to "raise the money or get the money," but "came up empty."

Post-conviction counsel asked trial counsel why he did not cross-examine the agent from the Tennessee Bureau of Investigation ("TBI") who prepared the ballistics report regarding bullets recovered at the scene of the gas station shooting. Trial counsel replied, "[Petitioner] gave a confession where he said he shot. [Petitioner] had a weapon with him. . . . What we were doing was addressing the 'knowing' component of what the law said[.]" He continued, "The ballistics [report] with respect to [the bullets] came back to his weapon, the Glock, .40 caliber[.] The problem with that was, all the witnesses said [Petitioner] was shooting. One witness who we couldn't talk to said there was another shot, there was another shooter."

Post-conviction counsel reviewed the testimony of trial witnesses with trial counsel. Trial counsel admitted that the witnesses at trial did not actually say they saw Petitioner shoot his gun but maintained that in the police reports, the witnesses said Petitioner was the shooter.

On cross-examination, trial counsel testified that he had practiced law for 16 years at the time of Petitioner's trial. He described himself as a "generalist," but confirmed that he had handled "criminal cases for awhile." Trial counsel testified that based on Petitioner's confession, there was "no reason to hire a ballistics expert." Trial counsel believed it would confuse the jury and negate "some of the mental elements necessary to prove him innocent, or at least not guilty of [first degree] murder." Trial counsel said that the strategy was to demonstrate that Petitioner's "intentions were not premeditated." Trial counsel explained that in light of Petitioner's confession, a ballistics expert would not help a jury to determine whether Petitioner's actions were premeditated. Trial counsel agreed that his strategy was successful. Trial counsel agreed that Ms. Smith's testimony would have been contrary to Petitioner's confession because of his statement that he was the only shooter.

Trial counsel testified regarding whether he should have presented proof of Petitioner having been bullied, stating, "We went through that believing that the temporal

relation between being bullied and the time of the shooting was too far apart to establish that he was still concerned about being bullied." Trial counsel explained:

> We also believed that the bullying set the predicate for premeditation, and that if he was motivated because he was bullied, the jury would definitely conclude he absolutely did this with premeditation and aforethought and it was planned out, regardless of how it looked and what his statement said. So those were the two primary concerns.

Trial counsel said that he had "secondary concerns" regarding how to establish Petitioner was actually bullied and "didn't want to paint a picture that [Petitioner] had some vendetta and was after someone."

On redirect examination, trial counsel acknowledged that Petitioner said in his statement he heard gunshots as he drove away from the gas station. However, trial counsel maintained that Petitioner also said he saw no one else shoot a gun.

Shamyra Smith testified that she was at the gas station at the time of the shooting. Ms. Smith said that she had "never" talked with trial counsel and did not believe he reached out to her. Ms. Smith recalled seeing the deceased victim and "numerous" guys with handguns shooting at each other. She stated that Petitioner was not one of the men who was shooting. Ms. Smith said that a detective interviewed her at the gas station and took her contact information. She stated that she never heard from the police afterwards. On cross-examination, Ms. Smith testified that she was Petitioner's family friend. Ms. Smith said she was at the gas station with a friend and saw "two guys [with guns]." She stated that she saw the men arguing and start shooting at each other. Ms. Smith claimed that the victim was pumping gas in the vicinity of the shooting. Ms. Smith recalled that the men wore red clothing. She said she heard "maybe six, seven shots." She claimed that she did not see Petitioner at the gas station. Ms. Smith admitted that she had multiple theft of property and forgery convictions.

Petitioner presented Christopher Robinson as a ballistics expert. Mr. Robinson testified that multiple firearms could have fired the bullets found at the gas station, including the bullet that killed the victim. Mr. Robinson testified that the TBI agent who prepared the ballistics report was not able to determine whether the bullets found at the gas station were fired from the same gun. Mr. Robinson stated that the TBI agent's ballistics report was overall lacking. On cross-examination, Mr. Robinson admitted to making various mistakes while working for the Georgia Bureau of Investigation ("GBI"), including shooting himself in the hand while testing a weapon and submitting muzzle-to-target findings prior to receiving an autopsy report. Mr. Robinson admitted that the GBI sent a letter to all elected district attorneys in Georgia regarding Mr. Robinson's work

because of the "result of identifiable discrepancies in the reported results of a case[.]" Mr. Robinson admitted that the Atlanta Police Department also fired him because of "grave concerns about [his] unethical decisions regarding illegal purchases and reckless disregard for following proper procedure and protocols."

The post-conviction court entered a written order denying post-conviction relief for several of Petitioner's claims but granted post-conviction relief for trial counsel's failure to "strongly dispute intent with respect to the lesser, included offense of second[ ]degree murder for fear of emphasizing evidence suggestive of premeditation."

The post-conviction court found that Ms. Smith's testimony was "consistent with her prior statement that there were at least two shooters and not necessarily inconsistent with inconclusive ballistics and the failure of other witnesses to see the shooter[s]." The post-conviction court found that while trial counsel failed to call a ballistics expert, he did attempt to procure a ballistics expert. Regarding Mr. Robinson's testimony, the court found that it supported a conclusion that the TBI agent's ballistics report did not support "a conclusion that the same gun" fired the bullets found at the gas station. The post-conviction court found that despite this evidence questioning the shooter's identity, Detective Emery's testimony regarding the gas station surveillance footage settled "the question of the numbers of shooters." The court stated that it was enough for trial counsel to briefly raise the issue of identity without "belaboring" it and concluded that trial counsel's failure to call Ms. Smith or a ballistics expert did not prejudice Petitioner.

The post-conviction court found strong evidence that Petitioner was severely bullied in school, that Petitioner "was still being bullied[,] and [that] the bullying had become, if it was not before, violent[.]" The court took judicial notice of Petitioner's mother's testimony regarding bullying evidence from Petitioner's bond-reduction hearing in August of 2010.[1] The court found that the evidence from Petitioner's bond-reduction hearing was critical "because it show[ed] that even before throwing a bottle at [P]etitioner's vehicle at the scene, [the] bullies had been violent and undeterred by school discipline." The court stated that this additional context provided understanding as to Petitioner's "pre-encounter awareness of a violent threat." The court summarized the bullying evidence as:

(1) [Petitioner's] own statement;

---

[1] The post-conviction court took judicial notice of the "08/02/2010 bond-reduction hearing" and quoted a portion of that hearing in its order granting post-conviction relief. However, a transcript of the hearing was not included in the record on appeal. *See* Tenn. R. App. P. 24(b).

(2) [Petitioner's] mother's account of trying to protect him from bullying at school, resulting in his missing lessons and eventually withdrawing from high school;

(3) other evidence of the presence of gang members at the scene;

(4) [Detective] Emery's account of the surveillance video and other evidence of a bottle shattering [Petitioner's] window on his arrival at the gas station, which he did nothing to provoke; and

(5) the subsequent shooting at [Petitioner's] father's house involving multiple weapons other than his.

The court found strong evidence that Petitioner reacted "to immediate violent provocation" rather than "initiat[ed] a violent encounter[,]" noting:

(1) [Detective] Emery's account of the surveillance video and other evidence of a bottle shattering his window on his arrival at the gas station, which he did nothing to provoke;

(2) the necessity for [P]etitioner to retrieve the gun from his passenger before he could use it;

(3) [P]etitioner's statement to investigators.

The post-conviction court found Petitioner's statements to Detective Emery, "I wasn't thinking," and, "because they always, like, picking at me[,]" to be "some of the most favorable evidence in support of a recklessness defense." The post-conviction court noted Detective Emery's statement that he told Petitioner he, Detective Emery, even knew Petitioner "did not mean to kill anyone." The court found that trial counsel underutilized the statement during cross-examination of Detective Emery. The post-conviction court stated that there was no evidence of Petitioner seeking out the bullies to "shoot or kill them."

The post-conviction court reasoned, "the [c]ourt cannot exclude a reasonable probability that, but for the strategic error in minimizing, for no valid reason, the issue of recklessness, on which issue the provocation by a person other than the victim is relevant, the outcome of trial would have been different." The court concluded that trial counsel's representation, in this respect only, was deficient and prejudiced Petitioner. The court entered an order vacating Petitioner's second degree murder conviction. The State appealed and Petitioner responded and included a cross appeal.

*Analysis*

The State argues that the post-conviction court erred in concluding that Petitioner received ineffective assistance of counsel and granting post-conviction relief. Petitioner responds that the post-conviction court properly granted post-conviction relief. Petitioner also raises two issues on cross-appeal regarding the post-conviction court's denial of post-conviction relief on his other ineffective assistance of counsel claims. The State responds that the post-conviction court properly denied relief as to those issues.

Post-conviction relief is available for any conviction or sentence that is "void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. In order to prevail in a claim for post-conviction relief, a petitioner must prove his factual allegations by clear and convincing evidence. T.C.A. § 40-30-110(f); *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998). On appeal, a post-conviction court's findings of fact are conclusive unless the evidence preponderates otherwise. *Vaughn v. State*, 202 S.W.3d 106, 115 (Tenn. 2006). Accordingly, questions concerning witness credibility, the weight and value to be given to testimony, and the factual issues raised by the evidence are to be resolved by the post-conviction court, and an appellate court may not substitute its own inferences for those drawn by the post-conviction court. *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001). However, the post-conviction court's conclusions of law and application of the law to the facts are reviewed under a purely de novo standard, with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

Both the Sixth Amendment to the Constitution of the United States and article I, section 9 of the Tennessee Constitution guarantee the right of an accused to the effective assistance of counsel. *See Davidson v. State*, 453 S.W.3d 386, 392-93 (Tenn. 2014). In order to sustain a claim of ineffective assistance of counsel, a petitioner must demonstrate that counsel's representation fell below the range of competence demanded of attorneys in criminal cases. *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Under the two-prong test established by *Strickland v. Washington*, 466 U.S. 668, 687 (1984), a petitioner must prove that counsel's performance was deficient and that the deficiency prejudiced the defense. *See State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel applied in federal cases also applies in Tennessee). Because a petitioner must establish both elements in order to prevail on a claim of ineffective assistance of counsel, "failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on

the claim." *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997). "Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 697).

The test for deficient performance is whether counsel's acts or omissions fell below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 688; *Henley*, 960 S.W.2d at 579. This Court must evaluate the questionable conduct from the attorney's perspective at the time, *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982), and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999).

Even if a petitioner shows that counsel's representation was deficient, the petitioner must also satisfy the prejudice prong of the *Strickland* test in order to obtain relief. The question is "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). A petitioner must show that there is a reasonable probability "sufficient to undermine confidence in the outcome" that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Burns*, 6 S.W.3d at 463 (quoting *Strickland*, 466 U.S. at 694).

*Evidence of Bullying*

The State argues that the post-conviction court erred in granting post-conviction relief. Specifically, the State contends that the post-conviction court second-guessed trial counsel's strategic decision not to utilize evidence of Petitioner's being bullied. Petitioner responds that the post-conviction court properly granted post-conviction relief. Petitioner maintains that trial counsel's strategic decision was made after less than complete investigation and therefore was unreasonable.

In evaluating an attorney's performance, we "must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462 (citing *Strickland*, 466 U.S. at 689). In addition, we must avoid the "distorting effects of hindsight" and must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. 689-90. Moreover, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Id*. at 688-89. However, "'deference to matters of strategy and tactical choices applies only if the

- 9 -

choices are informed ones based upon adequate preparation.'" *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting *Goad*, 938 S.W.2d at 369).

At the post-conviction hearing, trial counsel provided three reasons for not utilizing the bullying evidence. First, trial counsel stated that the "temporal relation" between the bullying and the shooting seemed too far removed to establish Petitioner's concern about the bullies. Second, trial counsel explained his apprehension that the bullying evidence might help the State establish the element of premeditation and that Petitioner planned out the shooting. Third, trial counsel had "secondary concerns" with proving that the bullying actually happened and "didn't want to paint a picture that [Petitioner] had some vendetta and was after someone."

The post-conviction court did not make a finding that trial counsel was inadequately prepared for trial. Rather, the post-conviction court, with the benefit of hindsight, concluded that trial counsel's representation was unreasonable and ineffective because he did not utilize the bullying evidence to argue reckless homicide.

At the time of trial, Petitioner was charged with first degree murder. It is clear from the record that trial counsel's focus was on procuring a conviction for a lesser included offense, which proved successful. The post-conviction court provided an in-depth review of Petitioner's history of being bullied and how trial counsel might have used the bullying evidence to convince a jury that Petitioner was acting recklessly. The court specifically pointed out that there was no evidence that Petitioner sought out the bullies to "shoot or kill them." As explained by trial counsel, however, he considered using the evidence of bullying and determined that the jury could find it to be evidence of premeditation. Trial counsel's detailed responses to the bullying line of questioning during the post-conviction hearing indicate that his strategic decision to exclude the bullying evidence was based on more than adequate preparation.

Based on our review, it is clear that the post-conviction court second-guessed trial counsel's successful strategy. Therefore, we conclude that trial counsel provided effective assistance of counsel and reverse the judgment of the post-conviction court. We reinstate Petitioner's conviction of second degree murder and accompanying sentence.

*Petitioner's Cross-Appeal*

Petitioner cross-appeals, arguing that trial counsel was ineffective for failing to call Ms. Smith as an eyewitness and for failing to hire a ballistics expert at trial. The State responds that the post-conviction court properly denied post-conviction relief on those grounds.

While Ms. Smith and Mr. Robinson's testimonies provided evidence that questioned the identity of the shooter, Detective Emery's testimony regarding the gas station surveillance video footage resolved "the question of the number of shooters." Detective Emery testified that in the video, somebody threw a bottle at Petitioner's white SUV, Petitioner drove away off-camera, and 30 seconds later everybody scattered at the gas station. The post-conviction court concluded that trial counsel's failure to call Ms. Smith or to hire a ballistics expert did not prejudice Petitioner because the theory of the case involved Petitioner's intent, not his identity. We agree with the post-conviction court that trial counsel's representation did not prejudice Petitioner.

*Conclusion*

Based on the foregoing, we reverse the post-conviction court's grant of post-conviction relief and reinstate Petitioner's conviction of second degree murder. All other findings of the post-conviction court are affirmed.

_____
TIMOTHY L. EASTER, JUDGE